CAPITOL DODGE SALES, INC v NORTHERN CONCRETE PIPE,
INC

Docket No. 65254. Submitted October 11, 1983, at Lansing.—Decided
December 19, 1983. Leave to appeal applied for.

William Washabaugh, an officer of Northern Concrete Pipe, Inc.,
contacted Capitol Dodge Sales, Inc., about the purchase of a
pickup truck with a snowplow attachment. John Fuller, a
salesman with Capitol Dodge, took Mr. Washabaugh for a test
drive in a pickup truck with an attached snowplow. Washa-
baugh liked the truck, but, before the test drive was complete,
the engine overheated. Washabaugh expressed concern about
this condition. Fuller indicated that the condition was a result
of incorrect positioning of the snowplow blade in front of the
radiator. Washabaugh indicated a willingness to purchase the
truck if Fuller's statement that the condition could be fixed was
correct. Fuller assured Washabaugh that such was the case,
documents of purchase were executed, and Washabaugh gave
fuller a check for the full price of the truck. It was agreed that
employees of Northern would pick up the truck on the follow-
ing day. On the following day, Fuller instructed the employees
of Northern who had come to pick up the truck on the proper
positioning of the snowplow blade. By the time that the North-
ern employees had reached Northern's place of business, the
truck's engine was again overheating. A call to Capitol Dodge's
service department elicited advice that the blade position be
rechecked and the radiator be refilled. After this was done,
another test drive still resulted in overheating. Northern was
advised to bring the truck to Capitol Dodge's service depart-
ment, which was done. By the time the truck reached Capitol
Dodge, it was overheating. Northern was advised that the truck
would be ready on the following day. Northern picked up the
truck on the following day. It again overheated on the way
back to Northern's place of business. Northern notified Capitol
Dodge that it was not taking the truck, that a stop payment on
its check had been issued, and that Capitol Dodge should come

REFERENCES FOR POINTS IN HEADNOTES
[1-4] 15A Am Jur 2d, Commercial Code § 34.
67 Am Jur 2d, Sales § 372 *et seq.*

and pick up the truck. Five days later Capitol Dodge took the purchase and registration documents to a branch office of the Secretary of State, and, at about the same time, Capitol Dodge received notice from its bank that Northern had stopped payment on the check. Two weeks later when title to the truck in Northern's name was issued by the Secretary of State, Northern attempted to tender the title to Capitol Dodge, but Capitol Dodge rejected that tender on the basis that the sale was complete. Capitol Dodge brought in 56th District Court an action to recover the purchase price. Northern brought third-party actions against John Fuller and Chrysler Corporation. Following a bench trial, Kenneth A. Hensen, J., concluded that Capitol Dodge had not received notice of rejection until after title had been transferred to Northern and that there had not been an effective revocation. Judgment was entered in favor of Capitol Dodge on its claim and in favor of Fuller and Chrysler Corporation on the third-party claims. Northern appealed to Eaton Circuit Court, which affirmed, Hudson E. Deming, J. Northern appeals by leave granted the circuit court order affirming the district court's judgment in Capitol Dodge's action. *Held:*

1. The opinion of the trial court contains few findings of fact, and some of the stated findings are clearly erroneous in light of the proofs presented. While the opinion contains no specific findings of fact as to the question of whether there had been a proper acceptance, the trial court's conclusions implicitly include a finding that there had been acceptance of the truck by Northern.

2. The trial court's implicit finding that there was acceptance of the truck by Northern was error. Under the Uniform Commercial Code, the mere taking of possession of goods by or the delivery of goods to a buyer does not constitute automatic acceptance. Acceptance of goods under the UCC takes place only after there has been a reasonable opportunity to inspect the goods.

3. A reasonable opportunity to inspect, when dealing with goods of a complex nature such as a truck under circumstances where the buyer necessarily depends upon the seller's expertise that the goods will perform properly in their intended use, is not limited to a mere visual inspection but rather contemplates that the buyer shall have an opportunity to put the goods to their intended use or to test the goods to determine whether the goods conform to the contract before acceptance will take place.

4. Since the truck failed to perform in accordance with the

use contemplated by plaintiff and defendant when they entered into the sales agreement, and since defendant rejected those goods after a reasonable inspection of the goods, there was no acceptance of the truck within the meaning of the sales provisions of the Uniform Commercial Code.

Reversed and remanded.

1. SALES — UNIFORM COMMERCIAL CODE — ACCEPTANCE OF GOODS.

The mere taking of possession of goods by or the delivery of goods to a buyer does not constitute automatic acceptance under the Uniform Commercial Code; acceptance under the UCC takes place only after there has been a reasonable opportunity to inspect the goods (MCL 440.2606[1]; MSA 19.2606[1]).

2. SALES — UNIFORM COMMERCIAL CODE — ACCEPTANCE OF GOODS.

Acceptance of goods of a complex mechanical nature for which, at the time of the taking of possession of those goods, the buyer necessarily depends on the seller's expertise on the question of whether the goods will perform properly in their intended use will not normally occur after a mere visual inspection at the time of delivery, since the Uniform Commercial Code provision which provides acceptance shall occur only after the buyer has had a reasonable time to inspect the goods contemplates that the buyer shall have an opportunity to put the goods to their intended use or to test the goods so as to be able to determine whether the goods perform as intended (MCL 440.2606[1]; MSA 19.2606[1]).

3. SALES — UNIFORM COMMERCIAL CODE — ACCEPTANCE OF GOODS.

A buyer of goods pursuant to a contract governed by the sales provisions of the Uniform Commercial Code may reject a tender of goods which fail in any respect to conform to the contract (MCL 440.2601; MSA 19.2601).

4. SALES — UNIFORM COMMERCIAL CODE — ACCEPTANCE OF GOODS — MOTOR VEHICLES.

The taking delivery of a motor vehicle does not constitute acceptance of such goods under the sales provisions of the Uniform Commercial Code until such time as the purchaser has had a reasonable opportunity to inspect the motor vehicle to ascertain whether it conforms with the sales contract; upon discovery of a failure of the motor vehicle to conform to the contract after a reasonable opportunity to inspect the motor vehicle the buyer has an absolute right to reject the motor vehicle.

*Scodeller, Wilson, DeLuca & Vogel* (by *R. David Wilson*), for plaintiff.

*James G. Halverson & Associates, P.C.* (by *James G. Halverson*), for defendant.

*Daudert & Basch, P.C.* (by *Charles J. Daudert*), for Chrysler Corporation.

Before: DANHOF, C.J., and BRONSON and W. R. PETERSON,* JJ.

W. R. PETERSON, J. Defendant appeals by leave granted from a district court judgment, affirmed on appeal to the circuit court, awarding plaintiff damages[1] for breach of contract for sale of a new 1979 Dodge pickup truck.[2]

Defendant claims that the trial court erred in finding that it had accepted the truck and in concluding that it had thereafter wrongfully attempted a revocation of the sale. We agree, finding that the evidence shows no acceptance within the meaning of the Uniform Commercial Code, MCL 440.2606; MSA 19.2606, and that defendant had an absolute right to reject the truck, MCL 440.2601; MSA 19.2601.

The evidence shows that on November 8 or 9, 1978,[3] an officer of defendant, William Washa-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] After a considerable delay, the parties stipulated to the sale of the truck prior to trial, and damages were awarded for the difference between the contract price and the proceeds of the sale.

[2] Defendant's third-party complaint against Chrysler Corporation and John Fuller resulted in a judgment for the third-party defendants which was not appealed.

[3] It is possible that, when the matter was tried in 1981, some of the witnesses who put events on November 9-10-11, were confused as to dates. It may well be that the events in question occurred on Wednesday, Thursday, and Friday, the 8th, 9th, and 10th rather than on Thursday, Friday, and Saturday, the 9th, 10th, and 11th. It may be doubted, for instance, that both businesses were open on a Saturday

baugh, called at plaintiff's place of business to discuss the possible purchase of a pickup truck with a snowplow attachment. The truck in question was of the type desired and plaintiff's salesman, John Fuller, took Mr. Washabaugh for a test drive in the vehicle. Washabaugh liked the truck. However, before the test drive was completed, the engine overheated. There was a conflict in the testimony of Fuller and Washabaugh which was not addressed by the opinion of the trial judge: Washabaugh testified that the temperature gauge was "all the way over" and that there was steam coming from under the hood; Fuller testified that the truck was just running warm, that there was no overheating, and that he saw no steam coming from the engine compartment.

Whichever version is correct, the significant fact is that the topic of engine overheating was specifically addressed by Fuller and Washabaugh. Washabaugh expressed concern about the matter, and indicated past experience with other vehicles suffering engine damage from overheating. Fuller said that overheating resulted from incorrect positioning of the snowplow blade in front of the radiator.[4] Washabaugh was willing to buy the truck if Fuller's statement was correct. Fuller assured him that that was in fact the case, documents of purchase were executed, and Washabaugh gave Fuller a check for the full payment of the purchase price. They agreed that employees of

afternoon, as all witnesses agree that they were on the third day of the sequence, or that plaintiff sent men to defendant's place of business on a Saturday night to pick up the truck. Plaintiff's president, Neil Mason, for instance, says that he saw the truck on his lot on Friday night, November 10th, *after it had been brought back by wrecker,* an event which happened on the third day.

[4] He also indicated that the risk of overheating from incorrect positioning of the blade would be increased when driving the truck at slow speeds; and, it was suggested at trial that the weather was then somewhat warmer than would be usual for November.

defendant would pick up the truck the following day and that they would be instructed on the proper positioning of the plow blade.

On the following day, Stanley Reid and Leon LaFave came to plaintiff's place of business to pick up the truck for defendant. Fuller personally showed them how to properly position the blade, and it was so positioned in Fuller's presence before Reid and LaFave left for defendant's place of business near Potterville. When they arrived there, the engine was overheating and steaming. A mechanic employed by defendant could find no apparent defects from a visual inspection, so a telephone call was made to plaintiff's office. An employee in plaintiff's service department advised rechecking the blade position, refilling the radiator, and taking the truck out for another drive. This was done. Reid and LaFave drove to Potterville, about two miles from defendant's place of business, and back. The engine again overheated, the temperature gauge rose to the maximum, and there was an eruption of water and steam.

LaFave again called plaintiff's office and was told to bring the truck into plaintiff's service department. He did so, and when he arrived the engine was again overheating and steaming. He was told that the problem might be with a thermostat but that the truck would be ready and could be picked up the following afternoon.

On the next afternoon (the third day, be it November 10 or 11), LaFave went to Lansing and picked up the truck. He was told that a radiator cap had been replaced. By the time he got back to defendant's place of business, the engine was again overheating. On Washabaugh's orders, LaFave immediately notified plaintiff by telephone that defendant was not taking the truck, that payment

was being stopped on the check,[5] and that plaintiff should come get the truck. Plaintiff sent a wrecker and crew that evening and towed the truck back to its lot.[6]

In the following days, plaintiff did nothing to the truck by way of inspection or repair. It was left sitting on plaintiff's lot. On November 15 or 16, the purchase and registration documents were taken by plaintiff to a branch office of the Secretary of State. On November 15 or 16, plaintiff received notice from its bank that defendant had stopped payment on the check.

Title to the truck was issued in defendant's name by the Secretary of State on December 1, 1978. Both parties retained counsel, and defendant made an effort to tender title to plaintiff so the truck could be resold. Plaintiff rejected the tender, taking the position that the transaction was complete and that it could not resell the truck because defendant held title, and commenced this suit.

The opinion of the trial judge is sparse in its findings of fact. As noted in footnote 6, the opinion contains the erroneous finding that defendant returned the truck to plaintiff's lot, implying that this was done without notice to plaintiff. There are no findings as to when plaintiff submitted the registration documents to the Secretary of State, nor were there findings or discussion of the events bearing on notice of rejection. Rather, the opinion merely states a conclusion that plaintiff received no notice of rejection until after title had been

---

[5] A stop payment order was made by defendant that day.

[6] LaFave could not recall the identity of the person with whom he spoke. Plaintiff's brief implies that there was no such call and states that defendant had no knowledge that defendant was rejecting the truck and stopping payment on the check until it was notified of the stop payment order by its bank on November 15 or 16. Plaintiff also claims that the truck was returned to its lot by defendant; the trial judge so found, but the only evidence on the point is to the contrary.

transferred to defendant, a conclusion which seems to be clearly erroneous. Moreover, the opinion of the trial judge contains no findings of fact, discussion, or conclusion as to an acceptance of the truck by defendant within the meaning of the Uniform Commercial Code, although the conclusion that acceptance had occurred can be implied from the opinion's statement of the issues as being: (1) whether the defendant had sustained the burden of proving the truck defective so as to justify a revocation after acceptance;[7] (2) if the truck was defective, whether plaintiff was given an opportunity to seasonably cure the defect;[8] and (3) whether plaintiff had a duty to resell the truck.[9]

We find the trial judge's decision on such issues inapposite, holding that on these facts the implied finding that there had been an acceptance of the truck by defendant is erroneous.

The Uniform Commercial Code, § 2-606 (MCL 440.2606; MSA 19.2606), provides:

"(1) Acceptance of goods occurs when the buyer

"(a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or

"(b) fails to make an effective rejection (subsection (1) of section 2602), but such acceptance does not occur

[7] MCL 440.2607(4); MSA 19.2607(4).

[8] MCL 440.2607(2); MSA 19.2607(2).

[9] Given our conclusions, we do not reach the question of the seller's duty to resell goods wrongfully rejected or returned on revocation of sale. Neither is it necessary to consider the holding of the majority in *Colonial Dodge, Inc v Miller (On Rehearing)*, 121 Mich App 466; 328 NW2d 678 (1982), that the Michigan Vehicle Code pre-empts the Uniform Commercial Code as to transfer of ownership of vehicles, a conclusion which we question at least as to the parties *inter se*. We note in passing that plaintiff herein could hardly claim the vehicle code as a shield, having taken steps to cause the issuance of title in the buyer's name after, and notwithstanding notice of, rejection by the buyer.

until the buyer has had a reasonable opportunity to inspect them; or

"(c) does any act inconsistent with the seller's ownership; but if such an act is wrongful as against the seller it is an acceptance only if ratified by him.

"(2) Acceptance of a part of any commercial unit is acceptance of that entire unit."

This language, in defining what constitutes an acceptance, clearly contemplates an act of the buyer beyond taking delivery or possession of the goods. Possession during the time necessary for the "reasonable opportunity" to inspect is contemplated prior to acceptance. Similarly, § 2-602 of the code[10] allows a rejection of goods for nonconformance "within a reasonable time *after their delivery*". Thus, while transfer of possession or title may be acts bearing on the question of acceptance, they are not in themselves determinative thereof. White & Summers, Handbook of the Law Under the Uniform Commercial Code (2d ed), § 8-2, p 296.

In *Colonial Dodge, Inc v Miller,* 116 Mich App 78, 322 NW2d 549 (1982), a majority of the Court adopted the holding in *Zabriskie Chevrolet, Inc. v Smith,* 99 NJ Super 441; 240 A2d 195 (1968), a case in which a newly purchased automobile became inoperable as the purchaser was driving it home from the dealer's showroom.[11]

*Zabriskie* is pertinent for two reasons. In the first place, when dealing with acceptance under the UCC, it speaks to the relationship between the manufacturer and seller of complex machines or

---

[10] MCL 440.2602; MSA 19.2602.

[11] Without consideration of the technical reasons why the car was inoperable, the fact of inoperability established its failure to conform to the contract of sale. We so view the overheating of the engine herein. The overheating is of such significance as to constitute a nonconformity without evidence as to the specific technical cause thereof.

devices on the one hand and the dependent buyer on the other hand. The buyer may be expert in the use of the machine or device but he generally has no expertise as to the mechanical, electronic, chemical, and engineering components that combine to produce the intended performance. *Zabriskie* recognized this buyer dependency on the seller's expertise in holding that something more than a mere visual inspection is appropriate before the buyer can be held to have accepted the machine. We agree. A "reasonable time to inspect" under the UCC must allow an opportunity to put the product to its intended use or for testing to verify its capability to perform as intended.

*Zabriskie* is also important for its holding that the adoption of the Uniform Commercial Code, § 2-601,[12] which provides that the buyer may reject goods which "fail in any respect to conform to the contract", creates a "perfect tender" rule replacing pre-code cases defining performance of a sales contract in terms of substantial compliance. We agree with that construction of the code.

In *Colonial Dodge,* the majority held that lack of a spare tire for a passenger car constituted nonconformity warranting rejection. On rehearing, 121 Mich App 466, 328 NW2d 678 (1982), a majority reversed the original decision on the ground that there was evidence to support the finding of an acceptance by the buyer, so that the question was not one of rejection but whether the nonconformity substantially impaired the vehicle's value to the buyer so as to justify revocation. The trial judge's determination that, in fact, the vehicle's value was not substantially impaired was affirmed, requiring reversal of the result arrived at by *Colonial Dodge I.* That reversal was not an abandon-

---

[12] MCL 440.2601; MSA 29.2601.

ment of the construction of the Uniform Code expounded in *Colonial Dodge I*, and this Court in *Colonial Dodge (On Rehearing)* expressly distinguished its holding from the result reached in *Zabriskie* where there had been no acceptance.

In the instant case, there was no acceptance.[13] Nothing that defendant did can be construed under § 2-606(1)(a) as signifying, after a reasonable opportunity to inspect, that the truck conformed or that defendant would retain the truck in spite of its nonconformity. Defendant had the absolute right to reject the truck for nonconformity within a reasonable time, and to seasonably notify the plaintiff thereof. MCL 440.2602; MSA 19.2602. It did so.

Reversed and remanded for entry of judgment in favor of defendant. Costs to defendant.

---

[13] The facts of *Colonial Dodge* differ also from those of *Zabriskie* in another respect which was noted indirectly in *Colonial Dodge (On Rehearing)* in the discussion of substantial impairment of value as justification for the revocation of an acceptance. Unlike *Zabriskie,* or the instant case, the missing spare tire of *Colonial Dodge* was not a latent defect such as could be discovered only by an expert or by testing. In determining whether there has been an acceptance in a given case, what constitutes a reasonable opportunity to inspect will depend upon the nature of the defect.