In re S.M. ACQUISITION CO., d/b/a Stylemaster, Inc., Debtor.

American National Bank and Trust Company of Chicago, Plaintiff,

v.

Matrix IV, Inc., Defendant.

Bankruptcy No. 02 B 10723.
Adversary No. 02 A 00283.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Jan. 13, 2005.

Shaw Gussis, Fishman, Glantz, Wolfson & Tobin, LLC, Chicago, IL, for Plaintiff.

Holland & Knight, LLC, for Defendant.

Funkhouser Vegosen Liebman & Dunn, Ltd., Gesas, Pilati, Gesas and Golin, Ltd., Trustee or Other Attorneys.

### *ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING REMAND*

JACK B. SCHMETTERER, Bankruptcy Judge.

### *PROCEDURAL HISTORY*

This Adversary proceeding relates to the Chapter 11 bankruptcy case filed by S.M. Acquisition Co. ("Stylemaster" or

"Debtor"). Plaintiff American National Bank and Trust Company of Chicago ("Bank" or "American")[1] sued Matrix IV, Inc.("Matrix") seeking a declaratory judgment that its lien in the Debtor's molds ("collateral") is superior to any lien possessed by Matrix.

Following trial, it was originally held and adjudged that while Matrix held a possessory lien on subject molds under the Illinois Tool and Die Act, the Bank held the prior and therefore superior lien granted to it by Debtor. *American National Bank & Trust Co. of Chicago v. Matrix IV, Inc. (In re S.M. Acquisition Co.)*, 296 B.R. 452, 467–474 (Bankr.N.D.Ill. 2003) ("*Stylemaster I*").

Upon appeal, the District Judge reasoned, as to the determination that Debtor had granted a prior lien to the Bank, that there was insufficient evidence in the record to determine whether Debtor held ownership rights in the collateral when it granted a lien to the Bank, since a party cannot grant a lien in property if it does not have ownership rights in that property. *American National Bank & Trust Co. of Chicago v. Matrix IV, Inc. (In re S.M. Acquisition Co.)*, No. 03 CV 7072, 2004 WL 1151575 at *2–4; 2004 U.S. Dist. LEXIS 7485 at *7–15 (N.D. Ill. April 29, 2004) ("*Stylemaster II*"). Accordingly, the proceeding was remanded here by order permitting further hearings and evidence on the limited issue of whether Stylemaster had ownership rights in its collateral that enabled it to grant the Bank a security interest on November 6, 1997, that by its terms applied to property then owned by Stylemaster or after acquired (discussed in *Stylemaster I*, 296 B.R. at 465, 467).

New evidence was taken here only on the remanded issue. For reasons detailed below in Additional Findings of Fact and Conclusions of Law, it is found and concluded that the Debtor either held in 1997 or later acquired sufficient ownership rights in the molds to grant the Bank a security interest under the 1997 security instrument. The original Findings and Conclusions were therefore warranted, under which it was found and held that the Bank's lien primed any lien held by Matrix.[2]

### ADDITIONAL FINDINGS PERTAINING TO THE ISSUE OF OWNERSHIP [3]

69. As of March 18, 2002, Matrix was in possession of 62 plastic injection molds. Plaintiff's Reopened Revised Exhibit 70 identifies these molds by part, description, seller, and year purchased. The Exhibit also assigns each mold a reference number. In addition to the descriptive terms adopted by the parties, each mold will subsequently be identified by its reference number. (Pl.'s Reopened Rev. Ex. 70.)[4] The following plastic molds (found hereinbelow to be owned by the debtor S.M. Acquisition Company) were in possession

---

1. Since commencement of this action, American has merged into Bank One NA, which was thereafter acquired by J.P. Morgan Chase & Co.

2. No further action may be taken by this Court due to the appeal still pending before the District Court. However, it is noted that a Memorandum Opinion on Plaintiff's Motion to Strike Defendant's Eighth Affirmative Defenses was prepared in April of 2003, but cannot be found on the Docket, nor is the intended order granting that motion found on the Docket. Authority is lacking here to remedy that omission unless the case is further remanded for that purpose.

3. Findings ¶¶ 69–129 are new following the remanded hearing.

4. "Pl.'s Reopened Ex." and "Def.'s Reopened Ex." refers to Plaintiff's and Defendant's documents admitted into evidence in the remanded trial.

556

of Matrix at the time of the original trial ("Molds") [5]:

1. 5991 B1
2. 5991 L1
3. 5502 B1
4. 1062 B
5. 5502 L1
6. 1063 B
7. 1064 B
8. 1061 B
9. 1061 L
10. 1062 L
11. 1063 L
12. 1064 L
13. 5500 B
14. 5990 L1
15. 5500 L
16. 1081 B
17. 1082 B
18. 1083 B
19. 1084 B
20. 8810 L
21. 8010 L
22. 8815 B
23. 5980 B1
24. 5980 L1
25. 8815 F
26. 6000 X
27. 5990 B1
28. 9005 B
29. 8040 L
30. 8932 C
31. 8932 X
32. 5995 R
33. 8932 W
34. 8932 H
35. 8960 H
36. 5895 L
37. 9005 L
38. 8960 L
39. 8060 L
40. 5895 B
41. 8960 B
42. 2042 L
43. 2042 B
44. 2032 B
45. 2000 X
46. 2030 L1
47. 2024 B
48. 2030 B
49. 2022 L
50. 2022 B
51. 2050 B
52. 2060 L
53. 2030 L2
54. 6502 L
55. 6980 L
56. 2060 B
57. 4300 B
58. 4300 H
59. 6990 L
60. 6991 L
61. 5990 B2
62. 6980 B/I

***The Molds Purchased from Plastic Product's Bankruptcy Estate ("Bankruptcy Molds")***

70. Pursuant to a Bill of Sale dated May 12, 1994 ("Bill of Sale") S.M. Acquisition purchased twenty-one molds from Plastic Products Estate, a Chapter 11 Debtor in Possession, at a public sale ("Bankruptcy Molds"). (Pl.'s Findings of Fact ¶5; Def.'s Findings of Fact ¶5.) The Bankruptcy Molds are further identified on Plaintiff's Reopened Revised Exhibit 70 as reference numbers 1–19, 27 and 56.

[5]. Molds 8960 L and 8060 L were each designated as #38 in Pl.'s Reopened Revised Ex. 70, but are renumbered here for clarity.

The Bill of Sale also transferred the name "Stylemaster, Inc." to S.M. Acquisition. (Pl.'s Reopened Ex. 2 ¶ (d)). Thereupon S.M. Acquisition began doing business as Stylemaster, Inc. S.M. Acquisition shall hereafter be referred to as Stylemaster. The Bill of Sale further transferred title to and right of possession of the Bankruptcy Molds to Stylemaster free and clear of all liens, charges, security interests and any other encumbrances. (Pl.'s Findings of Fact ¶ 7; Def.'s Findings of Fact ¶ 7; Pl.'s Reopened Ex. 2.)

71. Plastic Products Estate had previously purchased all of the Bankruptcy Molds from Cost Reductions Company. (Pl.'s Findings of Fact ¶ 6; Def.'s Findings of Fact ¶ 6.)

72. On May 13, 1994, the court entered an "Amended Order Approving Sale of Substantially All of Debtor's Assets Free and Clear of Liens at Public Sale," which included approval of Plastic Products Estate sale of the Bankruptcy Molds to Stylemaster. The court's original Order Approving Sale of Substantially All of Debtor's Assets Free and Clear of Liens at Public Sale was dated May 11, 1994. (Pl.'s Findings of Fact ¶ 8; Def.'s Findings of Fact ¶ 8.)

73. As of May 12, 1994 Stylemaster had title to each of the Bankruptcy Molds pursuant to Bill of Sale executed by David Anderson, as the duly authorized representative of Plastic Products Estate, a Chapter 11 debtor in possession. (Pl.'s Findings of Fact ¶ 39; Def.'s Findings of Fact ¶ 39.)

***The Molds Ordered From Cost Reductions Company ("Cost Reduction Molds")***

74. During the years 1998, 1998, and 2000, Stylemaster ordered thirty-three

molds from Cost Reductions Company ("Cost Reduction Molds"). The Cost Reduction Molds are identified on Plaintiff's Reopened Revised Exhibit 70 as reference numbers 20–25, 28–50, 52, 57, and 60.

75. Cost Reductions is a mold broker located near St. Louis, Missouri. The company contracts with Portugese mold manufacturers to build molds for its customers in the United States. (Pl.'s Reopened Ex. 65, Tanner Dep. at 5, 42–43.) Cost Reductions Company ("Cost Reductions") has supplied molds to Stylemaster since 1991. (Pl.'s Reopened Ex. 65, Tanner Dep. at 7.) Since 1998 Cost Reductions has used three different mold manufacturing companies to build molds for Stylemaster—Cidacos Molds, Monoforma and Azemoldes. (Pl.'s Reopened Ex. 65, Tanner Dep. at 51–52.)

***Stylemaster's Ordering Procedure with Cost Reductions***

76. Ms. Martha Williams ("Williams") is the current president of Stylemaster. As of Stylemaster's filing in 2002, Ms. Williams was the president, chief executive officer, and chief operating officer of Stylemaster. At all relevant times, Ms. Williams was responsible for contacting vendors and authorizing the purchase of molds on Stylemaster's behalf. Ms. Williams was also responsible for specifying the location for delivery of the completed molds. (Pl.'s Finding of Fact ¶ 18; Def.'s Finding of Fact ¶ 18; Williams Reopened Tr. 8/19/04 at 98–101 [6]; Pl.'s Reopened Ex. 65, Tanner Dep. at 8–11; Laverty Tr. 8/17/04 at 68.)

77. Stylemaster ordered and purchased molds from Cost Reduction according to procedures described below.

---

6. Reopened Tr. refers to the remanded trial transcript date and pages of the witness referred to.

78. Ms. Williams would contact Mr. Barry Tanner ("Tanner") of Cost Reductions to discuss engineering specifications, the type of product the mold would produce, and product design. (Pl.'s Reopened Ex. 65, Tanner Dep. at 8; Williams Reopened Tr. 8/19/04 at 98–99.)

79. Ms. Williams would also submit drawings and other documents pertaining to the design of each mold. Ms. Williams would also seek the advice and input of Mr. Raymond C. Wenk, Sr. ("Wenk") regarding the design of the molds. (Williams Reopened Tr. 8/30/04 at 44–45.)

80. Based on these preliminary discussions and documents, Cost Reductions would send Stylemaster a quotation for each mold. The quotation included the mold's price, freight, delivery, import duties, and related expenses. (Pl.'s Reopened Ex. 65, Tanner Dep. at 11, 32; Williams Reopened Tr. 8/19/04 at 122–124; Pl.'s Reopened Ex. 9.)

81. The quotation also included mold specifications, standard mold features, and a payment schedule. The quotation included a notion that all "molds are to run fully automatic unless otherwise noted." (Pl.'s Ex. 10 SMR 00010.) If Ms. Williams found the quotation to be acceptable, Stylemaster would send a signed purchase order to Cost Reductions. (Pl.'s Reopened Ex. 65, Tanner Dep. at 8.)

82. After receipt of the purchase order, Mr. Tanner would forward a purchase order, mold specification sheet and other documentation to one of Cost Reductions' mold manufacturers in Portugal. The manufacturer would then start building the mold according to Stylemaster's specifications. (Pl.'s Reopened Ex. 65, Tanner Dep. at 8, 15.) Cost Reductions did not sign the purchase orders submitted by Stylemaster. (Williams Reopened Tr. 8/19/04 at 124.)

## Terms and Conditions of Stylemaster's Purchase Orders

83. Stylemaster's purchase orders contained different and additional terms than those set forth in Cost Reductions' quotation.

84. Stylemaster issued preprinted purchase order forms to Cost Reductions. In all transactions prior to 2000, Stylemaster's purchase orders (the "old purchase orders") contained purchasing information on the front and back. The front of the old purchase orders contained a description of the mold to be purchased and general specifications and business terms, including terms relating to delivery, price and payment. Plaintiff's Reopened Exhibit 5 is a representative sample of the front of the old purchase orders.

85. The back of the old purchase orders contained additional terms and conditions. Plaintiff's Reopened Exhibit 4 is a representative sample of the back of the old purchase orders.

86. The Terms and Conditions provided, in pertinent part:

> This order contains the entire agreement of the parties. No modification thereof will be binding upon us, unless in writing dated subsequently and signed by vendor and accepted in writing.

> All materials furnished must be as specified. It is our privilege to return at seller's expense: (a) merchandise received after date, or dates, specified; (b) merchandise shipped in excess of this order; (c) merchandise not according to specifications; (d) merchandise that is not as represented; (e) defective goods.

> No goods returned shall be replaced without our formal replacement order. All goods furnished are subject to our approval before acceptance.

87. In 2000, Stylemaster began using computer-generated purchase orders (the "new purchase orders"). These purchase orders contained substantially the same information as the old purchase orders. Plaintiff's Reopened Exhibit 9 is a representative sample of the new purchase orders.

88. However, the new purchase orders did not contain the terms and conditions contained in the old forms and incorporated by reference a separately attached payment schedule. (Pl.'s Reopened Ex. 9 SMR 00007.) After the start of the year 2000, Stylemaster used the old purchase orders only for internal purposes and did not send them to vendors. (Williams Reopened Tr. 8/19/04 at 91–96.)

89. As a result, beginning in 2000, Stylemaster did not issue any purchase orders containing the old terms and conditions.

### The Sampling Process of the Cost Reduction Molds

90. Each injection mold took months to manufacture. (Williams Reopened Tr. 8/19/04 at 117.)

91. During the manufacturing process, Cost Reductions and Stylemaster communicated regularly concerning the design and progress of each mold. The companies exchanged drawings and documents relating to mold specifications and revised and updated the designs for the mold.

92. In an effort to make the manufacturing process as cost efficient as possible, each mold was sampled. The purpose of sampling was to determine a mold's production capability and whether the mold would produce an acceptable product. Sampling entails running a mold to produce a sample product. The number of samples during the manufacturing process depends on the particular mold. The sample was sent to Stylemaster for review, evaluation, and approval.

93. When these initial samples were run, the mold was not complete. The mold still required additional work such as adding texture, inserting water lines, and polishing. This additional work was not completed before initial samples were run because it was cost prohibitive to make design adjustments after these finishing touches are performed. After approval of the initial sample, the mold maker prepared the mold for final samples. Final samples were approved by the customer. Once final samples were approved each mold was shipped according to Stylemaster's instructions.

94. For the Cost Reductions Molds, the mold maker in Portugal ran all of the samples during the manufacturing process. (Pl.'s Reopened Ex. 65, Tanner Dep. at 8, 15.)

95. Ms. Williams was responsible for final approval of all molds manufactured for Stylemaster or its predecessor in interest. (Pl.'s Finding of Fact ¶ 18; Def.'s Finding of Fact ¶ 18.) Ms. Williams approved the final samples of the Cost Reduction Molds in issue here. (Williams Reopened Tr. 8/19/04 at 107–108.)

### Delivery and Payment of the Cost Reduction Molds

96. Pursuant to the terms of Stylemaster's purchase orders, Cost Reductions was responsible for shipping costs and clearing customs in the United States. Mr. Tanner testified that the mold manufacturer in Portugal would ship the completed molds to Cost Reductions' customs clearing broker in the U.S. (Pl.'s Reopened Ex. 65, Tanner Dep. at 9–10, 76.) After clearing customs, Cost Reductions would ship the mold to the delivery location specified by Ms. Williams. In most instances, Ms. Williams directed Cost Reductions to

shipped the Cost Reduction Molds directly from Portugal to Matrix.

97. Mr. Tanner testified that delivery matured Stylemaster's payment obligation. (Pl.'s Reopened Ex. 65, Tanner Dep. at 12–13.) Stylemaster paid for the Cost Reduction molds in monthly installments. (Pl.'s Reopened Ex. 65, Tanner Dep. at 12–13.) Upon delivery, Stylemaster put the Cost Reduction Molds into immediate production in great volume, as explained further below. (Findings ¶¶ 124–127.)

### The Molds Ordered from Chicago Mold Engineering Company, Inc. ("CME")

98. In 2001, Stylemaster ordered seven molds from Chicago Mold Engineering Co., Inc. ("Chicago Molds"). The Chicago Molds are identified on Plaintiff's Reopened Revised Exhibit 70 as reference numbers 26, 51, 53–55, 58 and 59. (Laverty Reopened Tr. 8/17/04 at 66; Pl.'s Reopened Rev. Ex. 70.)

99. CME is a mold manufacturer. CME has built molds for Stylemaster for over eight years. Unlike Cost Reductions, CME manufactures molds at its facilities in Chicago, Illinois. (Pl.'s Finding of Fact ¶ 21; Def.'s Finding of Fact ¶ 21; Laverty Reopened Tr. 8/17/04 at 63.)

### Stylemaster's Ordering Procedure with CME

100. The purchasing process between Stylemaster and CME was substantially similar to the manner in which Stylemaster purchased molds from Cost Reductions. (Pl.'s Finding of Fact ¶ 21; Def.'s Finding of Fact ¶ 21.)

101. For each mold, CME and Stylemaster engaged in preliminary discussions concerning its design, specifications, and capacity. Ms. Williams would submit design drawings and specifications. CME would then submit a quotation. After Stylemaster approved the quotation, it would issue a purchase order. After re-

ceipt, CME would commence building the mold. (Laverty Reopened Tr. 8/17/04 at 85; Pl.'s Reopened Ex. 71 SMR 00775.) Stylemaster paid for each mold according to a payment schedule. (Laverty Reopened Tr. 8/17/04 at 74.) CME was fully paid by December of 2001. (Laverty Reopened Tr. 8/17/01 at 74.)

### Sampling of the CME Molds

102. Although CME manufactured molds at its facilities, it did not own the necessary equipment to set up and sample molds. Stylemaster also did not have the capacity to run samples. (Laverty Reopened Tr. 8/17/04 at 112–113.) As a result, Matrix ran the samples for all of the Chicago Molds during the manufacturing process. CME shipped the Chicago Molds to Matrix for sampling and Matrix shipped the molds back during the various phases of the manufacturing process. (Laverty Reopened Tr. 8/17/04 at 76–88; Pl.'s Reopened Ex. 71 SMR 00775.)

103. Like the Cost Reductions Molds, the Chicago Molds would go through two or more samplings during the manufacturing process. Mr. Laverty testified that CME first shipped the Chicago Molds to Matrix for initial samples in January 2001. After sampling, Matrix would return the molds to CME. Laverty would meet with Ms. Williams to discuss any additional changes. CME would then make the additional corrections and ship them back to Matrix. Matrix would run the final samples.

104. Mr. Laverty testified that Stylemaster fully paid for all of the Chicago Molds by December 2001. (Laverty Reopened Tr. 8/17/04 at 74.) Stylemaster put the Chicago Molds into immediate production in great volume, as explained in detail below. (Findings ¶¶ 124–127.)

### Repairs and Debugging

105. Stylemaster directed both CME and Cost Reductions to ship molds to Matrix. Matrix housed these molds at its facilities.

106. As Ms. Williams testified, she did not personally inspect each mold upon delivery but depended on Mr. Wenk to notify her regarding the condition and status of a particular mold.

107. Stylemaster and Matrix entered into an agreement whereby Matrix would produce plastic products from the molds. After delivery of the molds to Matrix, Matrix would attempt to recreate the finished product based on the final sample. Each mold had to be "set-up" before it could be used in production. This included making adjustments to make sure that the mold was functioning properly and that it could meet the demands of a full production run.

108. Matrix experienced problems with particular molds that necessitated debugging and repairs. Debugging meant that each mold had to be set-up, tested by running sample products, and modified and/or repaired to make sure that the tool could produce acceptable products. The debugging process enabled Stylemaster to determine the production cost for each part, which was used to derive the wholesale price charged to its customers.

109. Several molds were delivered missing parts or containing defects. (Wenk Reopened Tr. 8/23/04 at 150.) As a result, Matrix had to be repair some of these molds before they could be put into production.

110. Both Stylemaster and the mold manufacturers paid for repairs. Ms. Williams testified that Stylemaster paid for repairs when the problems were caused by Stylemaster's faulty designs. (For example, Stylemaster designed one mold with the wrong dimension on the stacking rib, (Williams Reopened Tr. 8/19/02 at 113–114.)) Ms. Williams further testified that CME or Cost Reductions paid for repairs if a mold did not run or ran only for a short period of time. (Williams Reopened Tr. 8/19/02 at 113–114.)

### Problems with the Contempra Line Molds

111. Sometime in 1999, Ms. Williams designed a new product line referred to as the Contempra Line Molds. (Williams Reopened Tr. 8/20/2004 at 63–65.) Ms. Williams discussed the new product line with Mr. Wenk and asked him for suggestions regarding the engineering aspects of the Contempra Line Molds. Stylemaster contracted with both Cost Reductions and CME to manufacture molds for the Contempra Line in 2000. The Contempra Line Molds experienced significant problems after they were put into production and required substantial repair.

### Cost Reductions Problems with Contempra Line Molds

112. Cost Reductions contracted with Azemoldes to build the Contempra Line Molds. (Williams Reopened Tr. 8/20/04 at 63–64.) But Messrs. Tanner and Wenk, and also Ms. Williams, testified to the difficulties associated with these Molds. Mr. Tanner testified that the Contempra Line Molds suffered from leaking injection manifolds and water leaks. (Pl.'s Reopened Ex. 65, Tanner Dep. at 24.)

113. At some point in 2000, representatives from Cost Reduction and Azemoldes came to Matrix's facilities to evaluate the injection manifolds of the Contempra Line Molds. (Williams Reopened Tr. 8/23/04 at 37.)

114. Cost Reductions contracted to have a company called Swan Industries pick up and repair some of the Contempra Line Molds. (Pl.'s Reopened Ex. 65, Tan-

ner Dep. at 25.) Cost Reductions then sampled the molds at Swan Industries to make sure the molds were working properly, and shipped them back to Matrix. (Pl.'s Reopened Ex. 65, Tanner Dep. at 27.) Cost Reductions paid for these repairs. (Williams Reopened Tr. at 80.) Matrix also repaired other molds from the Contempra Line. (Pl.'s Reopened Ex. 65, Tanner Dep. at 26.)

115. One mold from the Contempra Line, Mold WX02000, suffered from significant defects. That Mold experienced significant leakage and other problems and was missing parts. (Wenk Reopened Tr. 8/23/04 at 199–200; Williams Reopened Tr. 8/23/04 at 45; Def.'s Reopened Ex. 107C MAX 06489–06493.) Mold WX02000 is identified as Reference Number 44 in Plaintiff's Reopened Revised Exhibit 70.

116. Ms. Williams and Mr. Wenk testified that Mold WX02000 had to be repaired several times by Cost Reductions and Matrix. Cost Reductions paid for the repairs.

117. Sometime in 2000 or 2001, Matrix shipped Mold WX02000 to a company called Midwest Die Mold to test that Mold's steel. Midwest Die Mold subsequently prepared a report of their examination. (Def.'s Reopened Ex. 43; Wenk Reopened Tr. 8/30/04 at 10–11.) Mr. Wenk also sent a letter to Ms. Williams describing his recommendations concerning Mold WX0200's performance. (Def.'s Reopened Ex. 43.)

118. After receiving these documents, Ms. Williams contacted Cost Reductions to make sure that Cost Reductions would pay for all repairs relating to this mold. Ms. Williams testified that she did not believe the Mold was incapable of producing the parts Stylemaster required, but she was concerned about maintenance issues.

119. At one point Mold WX02000 was returned to Azemoldes in Portugal for repairs. Azemoldes completed the repairs and returned the mold to Matrix's facility. Ms. Williams testified that although Mold WX02000 had several defects, the mold was put into production and produced over a million plastic products. (Williams Reopened Tr. 8/23/04 at 29–30.)

120. After the defects were brought to Ms. Williams' attention, Stylemaster continued to make payments for Mold WX02000. Ms. Williams testified that Stylemaster fully paid for the Contempra Line Molds. (Williams Tr. 8/23/04 at 110; Pl.'s Reopened Ex. 46.) Plaintiff's Reopened Exhibit 76 references a series of payments from Stylemaster for the Contempra Line Molds.

121. As Mr. Wenk testified, despite problems with the Contempra molds, Matrix was still able to produce millions of parts after the molds were delivered and before they were repaired by Cost Reductions.

122. Cost Reductions paid Matrix in excess of $90,000 for repairs made to the Cost Reduction Molds after they had been delivered to Matrix at Stylemaster's direction.

### CME Problems with Contempra Line Molds

123. Stylemaster contracted with CME to construct the Contempra Line Molds. Stylemaster returned the Contempra Line Molds to CME because they were producing unacceptable samples. Ms. Williams testified that Stylemaster submitted inaccurate design information. (Williams Reopened Tr. 8/19/02 at 114.) Stylemaster, for example, designed one mold with the wrong dimension on the stacking rib. (Williams Reopened Tr. 8/19/02 at 113–114.) CME made changes to these molds at the request of Ms. Williams. (Pl.'s Reopened Ex. 71 SMR 00762–00768.) Ms.

Williams accepted the molds after the changes. Stylemaster paid for these changes. CME was fully paid by December 2001. (Laverty Reopened Tr. 8/17/04 at 74.)

### Use of the Molds

124. All the molds in issue here were put into production by Stylemaster through Matrix's facilities. After July 25, 2001, Matrix produced in excess of nine million plastic pieces from the molds. Stylemaster marketed the plastic products to retail vendors and accepted orders for the plastic products.

125. Stylemaster pre-sold its products, meaning that contractual agreements with retail vendors that obligated Stylemaster to produce a specific number of plastic products were entered into before the molds were completed.

126. After shipment, Stylemaster insured and recorded each mold on its balance sheet. Stylemaster never returned or otherwise refused to keep any of the molds after approval of final samples and delivery to Matrix. Even when problems occurred with the molds after their initial delivery from the manufacturer, Stylemaster never rejected or returned any of the molds to Cost Reductions or CME. Stylemaster did not ask for any refund relating to any of the molds but continued to make payments for the Molds.

127. Many of the molds had the Stylemaster logo engraved onto them. Stylemaster did not license the logo to any third party.

128. After Cost Reductions completed its contractual performance, it did not assert any right or interest in the Cost Reduction Molds. After CME completed its contractual performance, it did not assert any right or interest in the CME Molds. The latest production date of plastic parts from any one of the molds was February 2002. (Pl.'s Finding of Fact ¶ 31; Def.'s Finding of Fact ¶ 31.)

129. Fact statements contained in the Additional Conclusions of Law shall also constitute Additional Findings of Fact.

## ADDITIONAL CONCLUSIONS OF LAW AS TO OWNERSHIP ISSUE

### INTRODUCTION

Preliminarily, revised Ill. UCC Article 9, which went into effect July 1, 2001, applies here even though the events under review occurred prior to that date. The revised Article 9 applies to all security interests "even if the transaction or lien was entered into or created before [the statute's] effective date[.]" 810 Ill. Comp. Stat. 5/9–702 (2004).

Three requirements must be met to create an enforceable security interest under Illinois law: (1) value has been given by the creditor; (2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and (3) either the debtor has executed a security agreement describing the collateral, or the collateral is not a certificated security and it is in possession of the secured party pursuant to the security agreement. 810 Ill. Comp. Stat. 5/9–203 (2004).

This Adversary has been remanded specifically to determine whether Stylemaster had sufficient ownership rights in the molds to enable it to grant a security interest to the Bank.

Neither the Uniform Commercial Code nor the version adopted in Illinois defines the phrase "rights in the collateral." A panel of the Seventh Circuit has explained that the requirement of rights in collateral illustrates the general principle that "one cannot encumber another man's property in the absence of consent, estoppel, or some other special rule." *In re Pubs Inc.*

*of Champaign,* 618 F.2d 432, 436 (7th Cir. 1980).

Cases interpreting earlier versions of the Illinois Code (which also used the phrase) described three ways in which rights in collateral may be obtained: 1) the debtor may have possession and title to the goods; 2) the true owner consents to the debtor's use of the collateral as security; or 3) the true owner is estopped from denying a security interest. *Midwest Decks, Inc. v. Butler & Baretz Acquisitions, Inc.,* 272 Ill.App.3d 370, 208 Ill.Dec. 455, 649 N.E.2d 511 (1995).

The remand order specified that only ownership rights are at issue. *Stylemaster I* concluded that Stylemaster had possession of the molds, and the District Court opinion agreed. *Stylemaster II,* 2004 WL 1151575 at *3 n.6, 2004 U.S. Dist. LEXIS 7485 at *12 n.6 ("The Bankruptcy Court made evident its belief that Stylemaster had complete control over the molds and we see no reason to disturb that factual finding. We therefore conclude that, for the purposes of the Midwest Decks test, Stylemaster had 'possession' of the molds.")

Stylemaster purchased and thereby acquired title to the Bankruptcy Molds at a court approved sale. It is therefore clear that Stylemaster owned the "Bankruptcy Molds." *See* Additional Findings of Fact, supra, ¶¶ 70–73.

### Stylemaster had Title to the Cost Reduction and Chicago Molds

The Bank also carried its burden in this litigation of proving that Stylemaster owned the Cost Reduction and Chicago Molds. *Kondik v. Ebner (In re Standard Foundry Products, Inc.),* 206 B.R. 475, 478 (Bankr.N.D.Ill.1997) ("the burden of proving that an item of property is subject to a security interest is on the party asserting the interest.")

■ A debtor acquires rights in collateral when a debtor obtains title pursuant to a sales contract. *See Kunkel v. Sprague National Bank,* 128 F.3d 636, 641 (8th Cir.1997) (holding that debtor had title under its contractual agreements and therefore had rights in collateral sufficient to grant a security interest). The provisions of Article 2 of the Illinois Commercial Code, which governs contracts for the sale of goods, determine whether Stylemaster obtained title to the molds. *See, e.g. Kunkel,* 128 F.3d at 641 (holding that it was appropriate for the lower court to look to Article 2 of the UCC to determine whether debtor had "rights in the collateral."); *Federal Deposit Ins. Corp. v. Quality Inns, Inc.,* 735 F.Supp. 1311, 1316 (D.Md.1990) (contractual rights are sufficient for a debtor to acquire rights in collateral).

The Bank contends that each quotation and purchase order exchanged between Stylemaster and CME and Cost Reductions formed a valid sales contract providing for the purchase of each mold. According to the Bank, Stylemaster acquired the right to title pursuant to these contracts and title passed upon delivery. *See* 810 Ill. Comp. Stat. 5/2–401 (2004) ("unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods."). Matrix contends that Stylemaster never gained title, taking the position that the agreements between Stylemaster and its vendors formed a "sale on approval" transaction. *See* 810 Ill. Comp. Stat. 5/2–236 (2004). In sale on approval transactions, the buyer does not acquire title until acceptance of the goods. 810 Ill. Comp. Stat. 5/2–237 (2004). In this regard, Matrix argues that CME and Cost Reductions defaulted under the terms of the contract by failing to deliver conform-

ing goods; the default was never cured; and Stylemaster never accepted the goods because of their substantial deficiencies.

***Whether the Purchase of the Cost Reduction and Chicago Molds Constituted Sale on Approval Transactions***

Matrix contends that the following terms and conditions of Stylemaster's purchase orders resulted in a sale on approval transaction:

> CONDITIONS: THE ***RIGHT IS RESERVED TO CANCEL*** THIS ORDER IF DELIVERY IS NOT AS REQUIRED. (Front side of purchase order.)
>
> ***SUBJECT TO THE TERMS AND CONDITIONS PRINTED ON THE BACK SIDE HEREOF AND TO SPECIFICATIONS,*** DRAWINGS AND ADDITIONAL TERMS AND CONDITIONS REFERRED TO HEREIN AND/OR ATTACHED HERETO. (Front side.)
>
> This order contains the entire agreement of the parties. No modification thereof will be binding upon us, unless in writing dated subsequently and signed by vendor and accepted in writing.
>
> All materials furnished must be as specified. It is our privilege to return at seller's expense: (a) merchandise received after date, or dates, specified; (b) merchandise shipped in excess of this order; (c) merchandise not according to specifications; (d) merchandise that is not as represented; (e) defective goods. (Back side of purchase order, term no. 5.)
>
> No goods returned shall be replaced without our formal replacement order. All goods furnished are subject to our approval before acceptance. (Back side, no. 6.)
>
> Substitution must not be made for any items without prior written permission. (Backside, term no. 14)

Pl.'s Rev. Reopened Ex. 4 (emphasis added)

A sale on approval occurs where "delivered goods may be returned by the buyer even though they conform to the contract and the goods are delivered primarily for use." 810 Ill. Comp. Stat. 5/2–326 (2004). In sale on approval transactions the seller delivers goods to the proposed purchaser but they remain the property of the seller until the buyer accepts them. 810 Ill. Comp. Stat. 5/2–326 (2004), Official Comment.

Although the Illinois Commercial Code codifies the rights and obligations of the parties where a transaction is held to be a sale on approval, it is silent as to the factors that distinguish an ordinary contract for sale from a sale on approval transaction. Research reveals no controlling precedent in Illinois. Other jurisdictions, however, have established some guidelines.

■ A transaction qualifies as a contract for sale on approval when the buyer has an unfettered or absolute right to return the goods irrespective of whether they conform to the contract. *In re Alcom Am. Corp.,* 154 B.R. 97, 111 (Bankr.D.D.C. 1993) (citing *Associated Milk Producers, Inc. v. Ind. Dep't of State Revenue,* 512 N.E.2d 917, 919 (Ind.Tax Ct.1987), *aff'd,* 534 N.E.2d 715 (Ind.1989)).

In determining whether a buyer has this right, at least one court has held that it is appropriate to examine the transaction documents and the parties' performance. *Houghton Wood Prods. v. Badger Wood Prods.,* 196 Wis.2d 457, 464, 538 N.W.2d 621 (Wis.Ct.App.1995) (concluding that an arbitration provision, provisions allowing the buyer to retain title, invoices providing for an assessment of interest for late payments, and provisions permitting the buy-

er to complain are inconsistent with a sale on approval transaction.) In this case the terms and conditions do not contain any provisions inconsistent with a sale of approval.

Regardless of whether agreements between Stylemaster and its vendors are defined as contracts or sale on approval transactions, Stylemaster must have accepted the molds to acquire title. 810 Ill. Comp. Stat. 5/2–327 (2004) ("Under a sale on approval unless otherwise agreed ... the risk of loss and the title do not pass to the buyer until acceptance ...").

The sale on approval provisions in Stylemaster's purchase orders did not apply to every mold in dispute here. Ms. Williams testified that Stylemaster changed their purchase order forms in 2000. The new purchase orders did not contain the terms and conditions and Stylemaster stopped sending the old purchase orders to its vendors. Matrix disputes this testimony and points to the testimony of Mr. Laverty of CME and Mr. Tanner of Cost Reductions. (Def.'s Br. ¶ 12.)

Testimony regarding this issue by Messrs. Tanner and Laverty does not provide a clear answer. Mr. Laverty stated that he was vaguely familiar with the terms and conditions but indicated that he did not know whether they were part of CME's agreements with Stylemaster. Mr. Laverty also testified that the Stylemaster forms changed during the course of their relationship. (Laverty Reopened Tr. 8/17/04 at 87.) Mr. Tanner stated that he believed that the terms and conditions applied to all molds sold to Stylemaster but he agreed that the Stylemaster forms changed some time in the year 2000. (Pl.'s Reopened Ex. 65, Tanner Dep. at 3.)

The witness' uncertainty is understandable, given that both vendors supplied molds to Stylemaster for several years. Both witnesses, however, confirmed that Stylemaster's purchase orders changed in 2000 and accurately identified the old and new purchase orders. That both witnesses recalled the change and were able to distinguish between the old and new purchase orders corroborates Ms. Williams' testimony.

It must therefore be concluded, that not all contracts executed by Stylemaster for purchase of molds after 2000 did contain the same terms or sale and approval provisions, and not all of them were sale on approval contracts. This was true of all the CME Molds Reference Number 26, 51, 53–55, 58–59 and Cost Reduction Molds Reference Number 29, 41–50, and 52. (*See* Pl.'s Reopened Rev. Ex. 70.)

However, none of these differences are material here because even assuming *arguendo* that all agreements were "sold on approval," Stylemaster accepted all of the molds in issue.

### Stylemaster Accepted the Molds

Under Section 2–606 acceptance occurs when the buyer:

(a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or

(b) fails to make an effective rejection (subsection (1) of Section 2–602 [810 Ill. Comp. Stat. 5/2–602]), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

810 Ill. Comp. Stat. 5/2–606 (2004). The Bank argues Stylemaster accepted each mold after inspecting its performance dur-

ing the manufacturing process. Stylemaster notified its vendors of its intention to accept each mold by approving the final product sample. (Pl.'s Br. ¶ 51.)

Matrix replies that acceptance cannot occur before a buyer has an opportunity to inspect the mold, not the product. Matrix argues that the complex nature of the injection molding process required Stylemaster to put the molds into production in order to evaluate each mold's performance capability. The use of the molds during this evaluation period and the products produced therein is said to have been simply part of the inspection period permitted by statute. *See United Air Lines Inc. v. Conductron Corp.*, 69 Ill.App.3d 847, 26 Ill.Dec. 344, 387 N.E.2d 1272 (1979) ("If use of goods is necessary to allow proper evaluation of them, such use does not constitute acceptance."); *Capitol Dodge Sales, Inc. v. Northern Concrete Pipe, Inc.*, 131 Mich.App. 149, 346 N.W.2d 535 (1983) (holding that there is no acceptance unless buyer has a reasonable opportunity to inspect).

Under the facts demonstrated here, that argument is without merit. First, all the parties to the contracts testified that their understanding was that a mold was accepted after approval of a final sample. Matrix contends that this testimony should be barred by the parole evidence rule. That argument was rejected in *Stylemaster I*, 296 B.R. at 465–67 (holding that the third party exception to the parole evidence rule remains the authority in the Seventh Circuit, and cases cited).

Second and equally important, any arguable defective condition of the molds was not latent. In some cases the defects were apparent at the moment of delivery. (*See* Def.'s Reopened Ex. 107C.) In other cases the defects were apparent after the mold was put into production.[7]

Under either scenario, Stylemaster was aware of each mold's defect either at the moment of delivery or once the mold was put into production. Despite this knowledge, Stylemaster choose to retain and use them to manufacture large numbers of its products. Mr. Wenk's testimony is illustrative in this regard. He recounted in some detail the problems associated with Mold WX02000 and the frequent repairs required to run the mold. He admitted, however, that despite the mold's poor condition and sub-par performance capability the mold was put into heavy volume production.

Furthermore, the evidence suggests that some of the problems with the Contempra Line Molds were caused by designs submitted by Stylemaster. (Williams Reopened Tr. 8/19/04 at 113–114.)[8]

Matrix suggests that the purpose of the inspection period is to encourage the seller and buyer to adjust their bargain and the buyer should not be made to engage in said adjustment at its peril. 1 James & White and Robert S. Summers, Uniform Commercial Code § 8–2 at 436 (4th ed.1995).

The circumstances of this case do not fit Matrix's argument. There is no detriment to the buyer when the buyer has knowledge of the defects and nonetheless choos-

---

7. Ms. Williams testified that each mold was put into production as fast as possible to enable the product to reach the market.

8. Ms. Williams testified as follows: "when we initially built these [molds], they were built, completed, and ready to run, ready for production, and they were in good running condition. However, they didn't stack the way they should have, so the rib was actually the wrong dimension. So when we designed them, we put the wrong dimension on the stacking rib." Williams Tr. 8/19/04 at 113–114.

es to retain and pay for the goods. *See, e.g. Atl. Aluminum & Metal Distrib. v. Adams,* 123 Ga.App. 387, 181 S.E.2d 101, 103 (1971) (finding acceptance where buyer made all payments with full knowledge of the claimed defects.) There is also no detriment to the buyer when the buyer contributes to the condition of the goods purchased. For instance, Ms. Williams testified that some of the problems with the Contempra Line Molds were caused by Stylemaster's flawed designs. (Williams Reopened Tr. 8/19/02 at 113–114.)

### Matrix did not Establish that it was Stylemaster's Agent

■ According to Matrix, Stylemaster retained it as an agent to report to Stylemaster when a mold was acceptable, and Mr. Wenk did not recommend any mold as acceptable. (Wenk's Reopened Tr. 8/30/04 at 18–23; Def.'s Br. ¶¶ 60–62.) Agency is a consensual fiduciary relationship in which one party, the principal, has the right to control the conduct of another, the agent, and the agent has the power to affect the legal relationship of the principal. *Kaporovskiy v. Grecian Delight Foods, Inc.,* 338 Ill.App.3d 206, 272 Ill.Dec. 453, 787 N.E.2d 268, 271 (2003). A party may establish the existence and extent of an agency relationship through circumstantial evidence from which it can be inferred that an agency relationship existed. *HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., Inc.,* 545 N.E.2d 672, 680 (Ill.1989). Nevertheless, the plaintiff must still prove specific facts regarding the circumstances of the situation from which the existence of the relationship can be inferred. *Id.* at 680. The party alleging an agency relationship has the burden of proving it by a preponderance of the evidence. *Mitchell Buick & Oldsmobile Sales, Inc. v. Nation-*

*al Dealer Serv., Inc.,* 138 Ill.App.3d 574, 93 Ill.Dec. 71, 485 N.E.2d 1281, 1287 (1985).

■ Matrix argues that an agency relationship was established pursuant to an oral contract. Matrix's primary evidence is the testimony of Mr. Wenk who testified that Ms. Williams asked Matrix to serve as Stylemaster's tooling, engineering, and debugging manufacturer. He stated that Ms. Williams relied upon his advice as to the status of each mold and its production capabilities. (Wenk Reopened Tr. 8/23/04 at 177.)

Wenk also testified that he attended meetings with Cost Reductions on Stylemaster's behalf, assisted in the design of many of the molds, and made recommendations to Ms. Williams as to which molds were or were not acceptable. (Wenk Reopened Tr. 8/30/04 at 22–24.)

■ That testimony by itself did not establish an agency relationship. It has long been held under Illinois law that neither the fact nor the extent of an agency can be proved solely by declarations of the purported agent. *Kapelski v. Alton & Southern R.R.,* 36 Ill.App.3d 37, 343 N.E.2d 207, 210 (976). Rather, agency must normally be established by evidence of acts of the principal or the statements of the principal to the agent or third persons. *Weil, Freiburg & Thomas, P.C. v. Sara Lee Corp.,* 577 N.E.2d 1344, 1349 (1991).

Matrix did not produce any corroborating evidence from Ms. Williams or any other representative from Stylemaster. Nor has Matrix pointed to any other evidence besides Mr. Wenk's testimony.[9]

Indeed, the testimony of the purported principal's representative, Ms. Williams, contradicted Mr. Wenk's testimony. She

9. Matrix cites as additional evidence a report produced by MidWest Die Company. Def.'s Br. ¶ 60. That report was admitted only to prove notice and its contents will not be considered.

stated that she relied on Mr. Wenk's advice but was not bound by it. Mr. Wenk admitted as much under cross examination.[10] Based on the foregoing, Matrix has not established the existence of an agency relationship.

Given that many of the molds were patently defective, Stylemaster had no reason not to notify its vendors of the defects in the goods within a reasonable time after delivery. Stylemaster was apparently in frequent contact with both CME and Cost Reductions regarding the repair work for the molds. But there is also no evidence of notification to CME or Cost Reductions of Stylemaster's intent to reject the molds. Not only did Stylemaster fail to reject the molds, it customized, retained and used the molds in heavy volume production over a substantial period of time.

■■■ This history shows conduct entirely inconsistent with the seller's continued ownership. *See The Softa Group, Inc. v. Scarsdale Development*, 260 Ill.App.3d 450, 197 Ill.Dec. 944, 632 N.E.2d 13 16 (1993); *Sherwin–Williams Co. v. March Charcoal Co., Inc.*, No. 80 C 4541, 1985 WL 3932 at *3, 1985 U.S. Dist. LEXIS 13846 at *8–9 (N.D.Ill. Nov. 15, 1985) (holding that when a buyer has used the goods provided by the seller, he cannot later claim that he has not accepted them); *Am. Theater Co. v. Siegel–Cooper & Co.*, 221 Ill. 145, 77 N.E. 588 (1906) ("The law does not permit a person to receive goods under a contract, appropriate them for his own use, and then defeat an action for the purchase price on the ground that the goods were not of the exact quality or description called for by the contract.") Matrix asserts that Stylemaster revoked

any acceptance by returning the molds for repair. This argument also fails. Stylemaster returned the molds only for some repairs or adjustments, but after repairs were completed the molds were returned to it for further use in large scale production. Furthermore, Stylemaster lost its right to revoke acceptance by its exercise of ownership over the goods. *Foley & Co. v. Excelsior Stove & Manuf. Co.*, 265 Ill. App. 78 (1932) (use of 8,000 catalogs of 25,000 printed constitutes acceptance of all of them); *Sherwin–Williams Co v. Mark Charcoal Co.*, 1985 WL 3932, 1985 U.S. Dist. LEXIS 13846 (holding that a buyer cannot revoke acceptance if it exercises dominion over the goods or permits them to be altered or changed while in its control).

On the basis of this evidence, it must be concluded that Stylemaster accepted each mold, and therefore owned them when it granted lien rights to the Bank. Consequently, the Bank has a properly perfected, valid, enforceable, first priority lien in each of the following plastic molds owned by the debtor Stylemaster:

1. 5991 B1
2. 5991 L1
3. 5502 B1
4. 1062 B
5. 5502 L1
6. 1063 B
7. 1064 B
8. 1061 B
9. 1061 L
10. 1062 L
11. 1063 L
12. 1064 L

**10.** Mr. Wenk testified as follows:
Q: And based upon your expertise and that opinion, you advised Ms. Williams, Stylemaster, that she should actually send these molds back to the moldmaker?
A: I said if I were you, Martha, on some of these, I would definitely reject these molds.
Q: Do you know if she ever did that?
A: I know she didn't do that.
(Wenk Reopened Tr. 8/30/04 at 32.)

13. 5500 B
14. 5990 L1
15. 5500 L
16. 1081 B
17. 1082 B
18. 1083 B
19. 1084 B
20. 8810 L
21. 8010 L
22. 8815 B
23. 5980 B1
24. 5980 L1
25. 8815 F
26. 6000 X
27. 5990 B1
28. 9005 B
29. 8040 L
30. 8932 C
31. 8932 X
32. 5995 R
33. 8932 W
34. 8932 H
35. 8960 H
36. 5895 L
37. 9005 L
38. 8960 L
39. 8060 L
40. 5895 B
41. 8960 B
42. 2042 L
43. 2042 B
44. 2032 B
45. 2000 X
46. 2030 L1
47. 2024 B
48. 2030 B
49. 2022 L
50. 2022 B
51. 2050 B
52. 2060 L
53. 2030 L2
54. 6502 L
55. 6980 L
56. 2060 B
57. 4300 B
58. 4300 H
59. 6990 L
60. 6991 L
61. 5990 B2
62. 6980 B/I

### *CONCLUSION*

Based on the foregoing and on the original Findings of Fact and Conclusions of Law, it is again concluded that Debtor held ownership rights in the subject molds as to which it granted a lien thereon to the Bank.