**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 4, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

---

IN RE: RAFTER SEVEN RANCHES L.P.,

    Debtor.

_____

RAFTER SEVEN RANCHES L.P.,

    Appellant,

v.

C.H. BROWN COMPANY,

    Appellee.

No. 07-3091

---

**Appeal from the United States Bankruptcy**
**Appellate Panel for the Tenth Circuit**
**(BAP No. KS-06-028)**
**(Bankr. No. 05-40483-12)**

---

William E. Metcalf of Metcalf & Justus, Topeka, Kansas, for Appellant.

Richard Petersen-Klein (Justice B. King and Donald Patterson with him on the brief) of Fisher, Patterson, Sayler & Smith, Topeka, Kansas, for Appellee.

---

Before **BRISCOE**, **SEYMOUR** and **LUCERO**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

Rafter Seven Ranches, L.P. (Rafter Seven) appeals a Bankruptcy Appeal Panel (BAP) decision upholding the bankruptcy court's rejection of Rafter Seven's objection to C.H. Brown Company's (Brown) claim that it was liable to Brown on certain equipment leases. *See Rafter Seven Ranches, LP v. C.H. Brown Company (In re Rafter Seven Ranches, LP)*, 362 B.R. 25, 27 (10th Cir. BAP 2007) (*Rafter II*). We have jurisdiction pursuant to 28 U.S.C. § 158(d), and we affirm.

## I

The facts and procedural history of this case have been fully reported in both *In re Rafter Seven Ranches, LP*, Case No. 05-40483, 2007 WL 2903200 (Bankr. D. Kan 2007) (unpublished), and *Rafter II*, 362 B.R. at 27 (10th Cir. BAP 2007). We repeat here only what is necessary to explain the issues.

Rafter Seven was interested in purchasing used sprinkler systems for use on its farm property. Its general partner, Michael J. Friesen, contacted Ochs Irrigation (Ochs), a used system dealer. Because Ochs did not have the appropriate used sprinklers in stock, Kenny Ochs located the desired sprinklers from another source. Rafter Seven did not have the funds to purchase the sprinklers, so Mr. Ochs suggested it contact Brown, a Wyoming private agricultural and equipment lender, to finance the purchase of the sprinkler systems. At a meeting on April 20, 2001, Brown agreed to a finance lease

arrangement whereby Rafter Seven could acquire four used sprinkler systems which Ochs would supply and install.

Brown forwarded four equipment leases to Rafter Seven for execution, one for each sprinkler system. Rafter Seven's general manager executed the leases on behalf of the company. The leases were for a term of five years, required semi-annual payments, and were to be governed by Wyoming law. The leases each provided that the lease payments would be due with respect to each item of equipment "when Lessee has received Equipment which is equal to 50% of the value to Lessor of all Equipment to be leased." Aple. Sup. App. at 134. In addition, the leases made it plain that Brown, the lessor, was not warranting the sprinklers for any purpose:

> WARRANTIES: Lessee agrees that it has selected each item of Equipment based upon its own judgment, and disclaims any reliance upon any statement of representations made by Lessor. LESSOR MAKES NO WARRANTY WITH RESPECT TO THE EQUIPMENT, EXPRESSED OR IMPLIED, AND LESSOR SPECIFICALLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY AND OF FITNESS FOR A PARTICULAR PURPOSE AND ANY LIABILITY FOR CONSEQUENTIAL DAMAGES ARISING OUT OF THE USE OR THE INABILITY TO USE THE EQUIPMENT. Lessee agrees to make the lease payments required hereunder without regard to the condition of the Equipment and to look only to persons other than Lessor, such as manufacturer, vendor, or supplier thereof, should any item of Equipment for any reason, be defective.

*Id.* Upon Rafter Seven's authorization, Brown sent payment to Ochs to fund purchase by Ochs of the sprinklers.

The parties were aware that the sprinkler systems were needed as soon as possible for the corn planting season ending May 1. When the sprinkler systems did not arrive during May, Rafter Seven wrote to Brown informing it that it had received neither the money for the leases nor the equipment. Upon receipt of the letter, Brown contacted Kenny Ochs, apparently urging him to make delivery.

The first sprinkler system was delivered and installed in late July. It did not conform to any of the leases in terms of serial number or equipment characteristics. Despite the nonconformity and some serious defects, Rafter Seven made use of the sprinkler system. On August 15, 2001, Rafter Seven sent a letter to Ochs regarding the remaining three sprinklers:

> By casual checking, I have learned that apparently you have used the money provided by C. H. Brown and Co. as well as money from Rafter Seven, in an amount exceeding $100,000 for purposes other than the purchase of sprinklers, generators and underground pipe. In other words, it appears that Rafter Seven and/or C. H. Brown Co. may need to recover (from you) more than $50,000. If you have any information to the contrary, it would be greatly appreciated.
>
> In the meantime, it would be my suggestion . . . that you get ready to make the first annual payments on three sprinklers that aren't delivered or functioning. Additionally, I believe that you should provide us with some form of tangible security such as mortgages, titles, or assignments until this matter is cleared.
>
> Unless I have the written response before August 23, to my home address . . . indicating the location of the sprinklers and generators, we will have to insist on a meeting to arrange a restructuring of your contract with Rafter Seven.

Aplt. App. at 127.

Sometime between mid-August and mid-September of 2001, two additional nonconforming sprinkler units were delivered to Rafter Seven. Friesen was in the fields when Och's employees made delivery. After examination, Friesen determined that the sprinklers were defective. He testified they were "rusty old stuff with flat tires that — it was just junk." Aple. Supp. App. at 186. He directed that the sprinklers not be installed. The equipment was left standing in the fields and was never completely assembled or made operational. The fourth sprinkler system was never delivered.

Approximately six weeks later, on November 1, 2001, Rafter Seven sent a letter to Brown stating that it would not honor the leases. This letter, which was sent before the first payments were due, stated:

> As we told Susie on the telephone last month, we have not insured the sprinklers - such as they are. *At that time, we mentioned that we might have to reject the sprinklers* and repudiate the lease. Nothing has happened since that conversation to change our minds.
>
> At the time of this writing, Mr. Ochs has partially installed one sprinkler. This sprinkler is not 1296 feet long, as promised, nor does it have a generator to provide power to the system. The sprinkler leaks to such an extent that the watering patterns are uneven. Additionally, two tower motors (or gear drives) are worn to the point that they are noisy. This sprinkler was delivered in July, after the crops were already stressed. We have tried to mitigate our damages by keeping our production costs low, but that alone did not prevent the yields from being a disaster.
>
> With respect to the other three circles, we can only say that there are no circles with crops underneath them, or operating sprinklers. *As this summer became fall, we continued to believe that the two antiquated, dysfunctional systems standing in the weeds would*

-5-

*somehow become operational in time to plant wheat.* They have not. Not only has Rafter Seven lost 390 acres of irrigated row crops, but we have lost the benefit of timely planting the fall wheat crop. The minimum loss now exceeds the entire lease amount of $80,000. Rafter Seven cannot honor the lease agreement under these circumstances.

*We are sorry to take this position and will be willing to work toward another agreement that might resolve this loss.*

Aplt. App. at 129-30 (emphasis added).

After receiving this letter, Brown phoned Friesen. Brown told him that it had no responsibility for breach of warranty, and that Rafter Seven was still liable under the leases. Hence, on November 23, 2001, Rafter Seven sent Ochs a letter saying it expected Ochs to pay Brown for the sprinkler systems. The letter also indicated Rafter Seven would try to hire someone to move or modify the existing systems to try to make them operational so as to mitigate further damages. Specifically, the letter states:

> As you know, Rafter Seven Ranches, LP, has repudiated its lease agreement with C. H. Brown Co. The obvious reason was the failure of consideration, in that there was no performance on behalf of the lessee because the contracts (which were designated as true leases) were not fulfilled in a timely manner. As a result, Rafter Seven completely lost the production on three circles and suffered substantial losses on the fourth. A conservative loss estimate is $20,000-$25,000 per quarter. In other words, the failure of Rafter Seven to receive four sprinklers, (1985 or newer) 1296 feet long, in working order, so that irrigated crops could be planted and insured has caused us the value of the entire lease. This does not include approximately $25,000 in cash advances paid by Rafter Seven. It now appears that Rafter Seven will lose its FSA cost share grant unless the installation on the home quarter is completed within thirty days.

I have, of course, been in touch with Mr. Brown, who indicated that we would be contacting him with a date for a conference telephone call - - which I assume to be an attempt to resolve this problem. I have not heard from you in this regard, therefore let me suggest the following approach: since you guaranteed payment of this indebtedness, I have enclosed a payment notification form and self-addressed envelope to the Brown Co. for the first payment. There will be seven more of similar amounts in the next 12 months. You can probably absorb these, but I'm sure that Mr. Brown would like this confirmed.

I anticipate that Mr. Brown will want a new agreement. Rafter Seven will want a release and some idea about repayment, restitution or presentment of four generators and a fourth sprinkler. Mr. Brown and I both agree that if you can not perform, as I just suggested, that you advise him promptly with the written answer to this question: "where is the money?" or "what happened to Mr. Brown's $80,000?"

*I will proceed to further mitigate Rafter Seven's damages by hiring other contractors to move or modify the existing systems to try to make them operate and I will attempt to purchase another system, be it new or used.* These additional costs should not be those of Rafter Seven so you should be advised that some recompense will be sought.

Aplt. App. at 45-46 (emphasis added).

No payments were ever made under the leases. Brown filed suit against both Rafter Seven and Ochs in Wyoming state court. It obtained a default judgment against Ochs, but the case against Rafter Seven was stayed when Rafter Seven filed for Chapter 12 bankruptcy. Brown filed a claim in the bankruptcy for payment on the leases, to which Rafter Seven objected. After a two day trial, the bankruptcy court overruled the objection, finding that Rafter Seven had accepted the goods and had failed to reject them seasonably as provided for in the Uniform

Commercial Code (U.C.C.), codified at WYO. STAT. ANN. § 34.1-1-109 *et seq.*
Rafter Seven filed a Motion to Reconsider asserting that the right to inspect includes a right to test and that because Ochs never sent complete sprinklers, Rafter Seven had no opportunity to test them and hence was never required by the U.C.C. to reject them. The bankruptcy court denied the motion, holding that the right to inspect did not include a right to test. Rafter Seven appealed to the BAP, which affirmed.

## II

Rafter Seven contends on appeal that the bankruptcy court and the BAP erred in concluding Rafter Seven had no right to test the sprinklers before the obligation to notify Brown accrued. It also asserts the bankruptcy court erred in deciding the case on issues Rafter Seven claims were not included in the pretrial order or any other pleading. Finally, it argues that the bankruptcy court abused its discretion in denying Rafter Seven's Motion to Reconsider.

We review *de novo* the bankruptcy court's legal conclusions, but we review the findings which underpin the conclusions under the clearly erroneous standard. *Brown v. Gullickson (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir. 1997). "We review *de novo* mixed questions consisting primarily of legal conclusions drawn from the facts." *Id.* We review for abuse of discretion the specific issue of whether the bankruptcy court properly decided the case based on what was

-8-

included in the pretrial order.  *See Ellis v. Ark. La. Gas Co.*, 609 F.2d 436, 439

(10th Cir. 1979).  We similarly review for abuse of discretion the district court's

denial of the motion for reconsideration.  *See Matosantos Commercial Corp. v.*

*Applebee's Int'l, Inc.*, 245 F.3d 1203, 1213 (10th Cir. 2001).

***Right to Test***

Rafter Seven's appeal does not challenge the facts as gathered at trial and

recounted by the bankruptcy court.  Rather, it contends it had a right to test the

equipment before it was required to reject it, implying there was no time frame

within which it was required to test.  The applicable statutes dictate otherwise.

The right to inspect, synonymous with the right to test, is not separate from the

obligation to notify the lessor of rejection within a reasonable time.

Under WYO. STAT. ANN. § 34.1-2.A-407, a commercial lessee's promises in

a finance agreement become irrevocable and independent upon acceptance of the

goods.  Because this is a finance lease, acceptance of goods with the knowledge

of nonconformity precludes revocation of acceptance.  *Id*. at § 34.1-2.A-516(b).

Acceptance of goods is defined in § 34.1-2.A-515(a).

> Acceptance of goods occurs after the lessee has had a reasonable
> opportunity to inspect the goods and: (i) [t]he lessee signifies or acts
> with respect to the goods in a manner that signifies to the lessor or
> the supplier that the goods are conforming or that the lessee will take
> or retain them in spite of their nonconformity; or (ii) [t]he lessee
> fails to make an effective rejection of the goods (section
> 34.1-2.A-509(b)).

*Id.*  Under § 34.1-2.A-509(b), "[r]ejection of goods is ineffective unless it is

within a reasonable time after tender or delivery of the goods and the lessee seasonably notifies the lessor." If, as here, no time for rejection is prescribed by the relevant agreement, then a "reasonable time for taking any action depends on the nature, purpose and circumstances of such action." *Id.* at § 34.1-1-204(b). An action is taken "seasonably" if it is taken "within a reasonable time." *Id.* at § 34.1-1-204(c).

Rafter Seven contends it did not accept the sprinklers within the meaning of § 34.1-2.A-515 because it never had an opportunity to test them given that they were not even delivered in usable form. Application of the law to the facts does not support Rafter Seven's position. Rafter Seven received the first sprinkler in late July. Knowing the sprinkler did not conform, Rafter Seven kept it and made use of it anyway. Use of a nonconforming good constitutes acceptance. *See* 34.1-2.A-515(a)(i). Although Rafter Seven did not use the second and third sprinklers, received between mid-August and mid-September of 2001, it failed to effectively reject them. It inspected the second and third sprinklers upon delivery, determined they were "junk," refused to have them assembled, and then let them sit in the fields for approximately six weeks before making what it argues is a rejection of the goods. Effective rejection of the goods did not occur until, at the earliest, November 1, 2001, when Rafter Seven wrote its letter to Brown. Even if we assume this letter constituted an unambiguous rejection of the sprinklers, six weeks was an unreasonable period of

-10-

time to inspect given the facts of this case.

To convince us otherwise, Rafter Seven cites *Capitol Dodge Sales, Inc. v. N. Concrete Pipe, Inc.*, 346 N.W.2d 535 (Mich. App. 1983). In *Capitol Dodge*, a commercial company sought to buy a truck with a snowplow attachment. *Id.* at 537. During the test drive, the truck overheated. The seller represented that the overheating was the result of incorrect placement of the snowplow attachment. The buyer accepted the explanation and attempted to properly attach the snowplow per the seller's instructions. Over the next two days, the vehicle overheated several times and the buyer repeatedly contacted the seller, ultimately telling him he did not want to buy the truck. *Id.* at 537-38. Upon suit, the seller contended the buyer's use of the truck constituted acceptance, while the buyer claimed he was only exercising his right to a reasonable inspection period. The court held that approximately three days of inspection was not unreasonable. *Id.* at 540.

In *Colonial Pacific Leasing Corp. v. JWCJR Corp.*, 977 P.2d 541 (Utah App. 1999), also cited by Rafter Seven, an auto shop purchased a computer and software system financed by Colonial Pacific. On the day of delivery, the debtor informed the creditor that the equipment was received but not yet operational. *Id.* at 543. On the second day, the creditor contacted the debtor and this time the debtor informed it that the software system was working. Later that same day, the system crashed. The debtor called the software company but was unable to get

-11-

the system working.  Soon after, the debtor contacted the software company to come and pick up the equipment.  *Id.*  The debtor also called the creditor twice within ten days of the system crashing to inform it that the equipment was not operational.  *Id*. at 546.  Through his conversations with the creditor, the debtor understood that he was no longer obligated on the lease due to his rejection of the goods.  *Id.*

More than two years later, the creditor brought suit against the debtor to recover unpaid lease payments.  The trial judge ruled for the creditor.  The appellate court reversed, holding that the trial court failed to make factual findings about whether the debtor had a reasonable opportunity to inspect the system.  In so doing, the court noted:

> Taking possession of the goods is not determinative of acceptance, nor is the signing of a form acceptance before receipt of goods, nor the making of a lease payment.  A reasonable time to inspect under the UCC must allow an opportunity to put the product to its intended use, or for testing to verify its capability to perform as intended.

*Id*. at 545 (internal citations and quotation marks omitted).  We agree with this interpretation of a reasonable time to inspect or test, but that does not change the outcome of this case.

The facts of both *Capitol Dodge* and *Colonial Pacific* diverge significantly from those here.  With respect to the second and third sprinklers, Rafter Seven recognized immediately that the used sprinklers delivered to it were nonconforming to the leases and were "junk."  No testing was necessary to

determine nonconformance. Instead of notifying Brown, however, Rafter Seven left the sprinklers sitting in the field. This is in stark contrast to *Capitol Dodge* and *Colonial Pacific*, where the buyers attempted to put the purchased goods to use and immediately contacted the appropriate party upon finding the defects.

Seasonable rejection is intertwined with the concept of a reasonable time to inspect. *See* § 34.1-1-204. For either concept, the reasonable time period is tied to the difficulty of discovering the nonconformity. *See* 1 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 8-3 at 447-48 (4th ed. 1996) (hereinafter WHITE & SUMMERS). In this case, Rafter Seven knew immediately on inspection that the second and third sprinklers were nonconforming because not all of the parts were delivered and the equipment was not operable. Case law supports the conclusion that Rafter Seven's time to reject was relatively short in these circumstances. *Compare Pioneer Peat, Inc. v. Quality Grassing & Servs., Inc.*, 653 N.W.2d 469 (Minn. App. 2002) (one month lapse between acceptance and rejection not reasonable where company knew product was nonconforming); *McClure Oil Corp. v. Murray Equip., Inc.*, 515 N.E. 2d 546, 552 (Ind. App. 1987) (ineffective rejection where buyer did not give unambiguous rejection until nineteen days after receipt of product during which time he used product, claimed to be dissatisfied with product from first day of use, and ordered alternative equipment nine days after receipt of disputed equipment); *EPN-Delaval, S.A. v. Inter-Equip, Inc.*, 542 F.Supp. 238, 243, 247

(S.D. Tex. 1982) (where defect is total and blatant, sixty-five days constitutes unreasonable rejection time); *with Integrated Circuits Unlimited, Inc. v. E.F. Johnson*, Co. 691 F. Supp. 630, 631, 634 (E.D.N.Y. 1988) (one month reasonable where purchaser actively testing complex electronic equipment), rev'd on other grounds, 875 F.2d 1040 (2d Cir. 1989); *Tri-Continental Leasing Corp. v. Law Office of Richard W. Burns*, 710 S.W.2d 604 (Tex. App. 1985) (testing time of one month reasonable where equipment malfunctioned immediately and buyer was constantly working with seller to make equipment operable); *Moses v. Newman*, 658 S.W.2d 119 (Tenn.App.1983) (one day not long enough to constitute reasonable time to inspect).

Rafter Seven knew upon inspection that the equipment was nonconforming, yet it did nothing to reject the second and third sprinklers for at least six weeks after they were delivered.[1]  According to the specific language of the statute, these actions are consistent with acceptance rather than rejection.  *See* § 34.1-2.A-515 (acceptance occurs when lessee does any of three things after a reasonable opportunity to inspect the goods: (a) signifies acceptance; (b) fails to make an effective rejection; or (c) does any act that signifies acceptance).  While

---

[1]Rafter Seven contends it rejected the second and third sprinklers when it made clear to Och's installers that they were unacceptable.  We are not persuaded.  Under § 34.1-2.A-515, Rafter Seven had an obligation to notify Brown, the lessor, of its rejection, which it did not do until its letter of  November 1, 2001.  Furthermore, that letter itself indicates that Rafter Seven continued to hope the dysfunctional sprinklers would become operational.  *See supra* at 5-6.

-14-

a reasonable opportunity to inspect and test is available under the UCC, six weeks was an unreasonable period in the circumstances of this case, given Rafter Seven's immediate recognition of the defective condition of the equipment.

WHITE & SUMMERS make clear why "speedy notification" is important:

> The policies for speedy notification are not mysterious. The obvious policies behind the notice provisions are to give the seller [here, the lessor] an opportunity to cure, to permit the seller to assist the buyer in minimizing the buyer's losses, and to return the goods to seller early — before they have depreciated, rotted or worse. If the seller can cure the difficulty and so save the sale and prevent lost profits that the buyer might otherwise suffer, the policy has been fulfilled. Even if the seller's inspection discloses that the goods are defective and the seller agrees to take them back, the entire loss from the transaction may be minimized by early action, because the seller may be able to resell the goods to another party and at a higher price than the goods would command after they had depreciated.

WHITE & SUMMERS at 445-46.

The dissent does not believe "the Uniform Commercial Code [would] really leave a lessee in Rafter Seven's position to be so rooked without recourse," dissent at 5, and suggests we are ignoring the realities of the situation. To the contrary, as the lease agreements note, this is a case in which the lessee, Rafter Seven, chose the supplier, Ochs, and authorized the finance lessor, Brown, to pay the supplier for the cost of the sprinklers before the goods were delivered to the lessee. This is also a case in which Rafter Seven agreed that Brown would not be responsible for warranting the fitness of the equipment, and that Rafter Seven would look only to Ochs in the event that any item of equipment was defective.

-15-

As one court has explained in a tripartite situation such as this:

> When the commercial context has been, as here, a financing lease, the weight of authority is that the consideration which flows from the financing lessor is money, not a functioning product. Accordingly a breach by the supplier of the equipment does not excuse the lessee from making lease payments to the finance-lessor, unless the equipment lease otherwise provides. Where, as in many lease documents with a finance-lessor (and in the instant case), there is an express disclaimer of liability for malfunctioning equipment, the position of the finance-lessor is that much stronger.

*Patriot Gen'l Life Ins. Co. v. CFC Investment Co.*, 420 N.E.2d 918, 922 (Mass. Ct. App. 1981) (footnote omitted) (citing cases). Given that Rafter Seven knew immediately, without testing, that the long-overdue sprinklers were non-conforming, it was clearly obligated by § 34.1-2A-515 to so inform Brown to whom it owed payments for financing the transaction. The bankruptcy court correctly determined that Rafter Seven had all the time it needed to inspect the facially nonconforming goods, and that its rejection was therefore not seasonable.[2]

### Bankruptcy Court Properly Addressed Timeliness of Rejection

Rafter Seven claims the bankruptcy court incorrectly decided the case because Rafter Seven's objection to Brown's claim was based on Ochs' complete failure to deliver the sprinklers described in the leases, *see* Aplt. App. at 108

---

[2]Given our conclusion on the merits, the bankruptcy court did not abuse its discretion in denying Rafter Seven's Motion for Reconsideration on this same issue.

-16-

("The debtor contends that the irrigation sprinklers which were the subject of the leases . . . were never delivered. . . . What was delivered to Rafter Seven was basically 'a pile of junk.'"), while the bankruptcy court's decision was based on Rafter Seven's failure to seasonably reject the sprinkler systems. Rafter Seven contends the bankruptcy court abused its discretion in deciding the case on an issue not identified in the pretrial order or other pleadings.

We do not agree. We are persuaded by our review of the record that the bankruptcy court's decision was based on the general issues and principles articulated by the parties in the pretrial order and the proceedings thereafter. The parties were well aware that the law governing this matter is Article 2A of the U.C.C., as codified in Wyoming. While Rafter Seven took the position that delivery of conforming goods was never made, the UCC makes clear that nonconforming goods may be accepted or rejected, and that any rejection must be done within a reasonable time with notice to the lessor. *See* WYO. STAT. ANN. §§ 34.1-2.A-509(b) & 34.1-2.A-515.

The record clearly reveals that the trial of the matter revolved around acceptance or rejection of the goods, and Rafter Seven did not object to that course of events. Under FED. R. CIV. P. 15(b)(2) "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised by the pleadings." The bankruptcy court clearly saw timeliness of rejection as the key to this case, *see* Aple. Supp. App. 201-22, and

-17-

Rafter Seven gives us no grounds to hold that the court abused its discretion in so doing.

For the foregoing reasons, we **AFFIRM**.

07-3091, <u>In re Rafter Seven Ranches, L.P.</u>

**LUCERO**, J., concurring in part and dissenting in part.

I agree with my respected colleagues that Rafter Seven Ranches accepted the first sprinkler system and used it in an attempt to mitigate its damages.[1] But I cannot accept that by leaving sprinkler parts in Rafter Seven's field in September, Ochs "delivered" the second and third systems. Were we to assume delivery, as the majority does, a "reasonable opportunity to inspect" includes the ability to test, which Rafter Seven never had during the six weeks before it notified Brown on November 1. Because the majority applies an unduly inflexible view of the U.C.C. that misapprehends the realities of this transaction, I respectfully dissent.

**I**

Let us be clear on what happened. As early as 2000, Ochs was promoting sprinkler systems to Rafter Seven and asked for and received "down payments" totaling about $25,000 for generators and nozzle packages to be part of a later sprinkler delivery. In April 2001, after Rafter Seven discouraged Ochs because it could not afford the complete systems, Ochs arranged for Friesen to meet with Brown. Under the terms of the lease agreements with Brown, Ochs was to supply Rafter Seven with four functional sprinkler systems around May 2001, in time for the planting season. The leases specified the manufacturer, model, and serial number of each sprinkler system. The "Delivery and Acceptance" clause of each

---

[1] I also agree with the majority that the bankruptcy court did not abuse its discretion by addressing the issue of timeliness.

Brown lease allowed Rafter Seven to certify that the equipment was "delivered, inspected, installed, . . . in good working condition, and . . . accepted by [Rafter Seven] as satisfactory" before approving Brown's payment to Ochs. Rafter Seven signed these clauses at the same time the leases were signed—a time when all parties knew the equipment was undelivered. This fiction allowed Brown to pay Ochs immediately, thus enabling the nearly contemporaneous acquisition and delivery of the sprinkler systems. Yet, the first sprinkler system was not delivered until sometime in July. Apparently, Rafter Seven was expected to pray for rain in the interim.

Although it is undisputed that the first system was woefully inadequate, Rafter Seven had no alternative but to use it in an attempt to salvage some of its crop. As for the other three systems, the record is unimpeachable: Ochs never delivered any other complete sprinkler systems in working condition.

When Ochs attempted to deliver a second and third system apparently as late as mid-September—at or near the end of the growing season—Friesen immediately recognized that the equipment was incomplete and did not match the serial numbers or specifications in the lease agreements. He pronounced it "junk" and asked Ochs' delivery men to remove it. When they did not, Friesen decided to make the best of a bad situation by waiting to see if they would complete the installation so that the sprinklers sufficiently conformed to the terms of each lease. He awaited delivery of numerous missing and replacement parts. They

never came.  Now Rafter Seven is in bankruptcy, Ochs has Brown's $80,000, and

Brown is attempting to recover lease payments from Rafter Seven for equipment

that Ochs never supplied.

## II

### A

Engaging in analytical hopscotch, the majority skips to inspection without

passing delivery.  As the "Delivery and Acceptance" clause of each leases shows,

all parties contemplated specific sprinkler systems delivered in good working

condition.  Such certifications are ordinarily signed at or after delivery.  See, e.g.,

Old Kent Leasing Servs. Corp. v. McEwan, 38 S.W.3d 220, 224-25 (Tex. App.

2001); EagleFunding Capital Corp. v. Kamar, No. 011928, 2002 WL 1020663, at

*1-2 (Mass. Super. Ct. Apr. 17, 2002).  Because Rafter Seven signed this clause

before delivery—otherwise, Ochs would have been unable to acquire the

equipment—it lost the ability to withhold payment from Ochs for unsatisfactory

equipment.  Nonetheless, the clause informs our understanding of the terms of the

leases:  installation of the sprinkler systems was part and parcel of the supplier's

performance and, necessarily, a prerequisite to inspection.  The majority assumes

delivery occurred, Maj. Op. at 10, a fatal oversight I cannot condone.

The idea that delivery is not effected willy-nilly any time a supplier dumps

some parts on a lessee is hardly revolutionary.  In Moses v. Newman, 658 S.W.2d

119 (Tenn. Ct. App. 1983), cited by the majority, a buyer purchased a mobile

home that was later destroyed by a windstorm before the seller had completed installing it. Id. at 120. Despite the fact that the buyer had made multiple trips to see the house before purchasing it, and despite the fact that he had placed personal items in the trailer, the court held that the buyer had not yet had a reasonable opportunity to inspect it largely because the seller had contracted for delivery and installation, and "the seller had not completed the contracted installation at the time of loss." Id. at 121-22; see also Davis v. Vintage Enters., Inc., 209 S.E.2d 824, 828-29 (N.C. Ct. App. 1974).

My colleagues imply that because "Rafter Seven left the sprinklers sitting in the field," Maj. Op. at 13; see also id. at 10, it somehow accepted a delivery. This is plainly contrary to Wyoming law. Rafter Seven, which had refused installation of the sprinklers after declaring them junk, did not bear the burden of removing them from its property. With language that could just as easily apply to the present case, the Wyoming Supreme Court has held:

> When [the buyer] told [the seller] that the machine was not workable without modifications, that can mean nothing else than that the machine which was delivered to the [buyer] was not successful, and hence the condition of a sale, if there was a sale, was not fulfilled. It is difficult to see what further notice of the lack of success of the machine could have been given. As already indicated, if [the seller] did not then want the [buyer] to retain possession, there was nothing at that time, or at any time thereafter, to prevent him from taking it back. The fact that it remained in [the buyer]'s possession was [the seller]'s own fault, at least as much as that of [the buyer].

Morgan v. Union Pac. R.R. Co., 346 P.2d 1071, 1077 (Wyo. 1959) (emphases

added).

Rafter Seven's decision to await actual delivery is eminently reasonable. The leases each specify that lease payments "shall commence when Lessee has received Equipment which is equal to 50% of the value." I refuse to call a pile of sprinkler parts, incapable of watering anything, valuable under this lease. For these reasons, Rafter Seven's November 1 letter to Brown was a seasonable rejection of Ochs' ineffective delivery.

**B**

The majority concludes that Rafter Seven's obligation to Brown is independent of Ochs' failure. Does the Uniform Commercial Code really leave a lessee in Rafter Seven's position to be so rooked without recourse? In my view, the answer is "no." Wyoming law is unambiguous in requiring that a lessee have a reasonable opportunity to inspect goods. See Wyo. Stat. Ann. § 34.1-2.A-515(a). As the majority recognizes, precedent requires that the opportunity to inspect must include a reasonable opportunity to test, and that reasonableness must be determined by the facts and circumstances of a particular transaction.

In asking what constitutes a "reasonable time" to inspect, we have a duty to look at the realities of the transaction rather than to simply count days.[2] Rafter

_____

[2] Even were we left to counting days, numerous courts have found seasonable rejection following inspection periods similar to, or even longer than, the period at issue here. See, e.g., Buckeye Trophy, Inc. v. S. Bowling & Billiard Supply Co., 443 N.E.2d 1043, 1046 (Ohio Ct. App. 1983) (sixty-five days

-5-

Seven was in an obvious bind. If it did not allow Ochs the opportunity to deliver and install sprinkler systems in working condition, it would assuredly lose its crops. Because Rafter Seven allowed Ochs a few more weeks to complete the systems, the majority holds that it failed to seasonably reject the sprinklers. This result is particularly odd because, although Rafter rejected the goods by telling the seller, Ochs, that the sprinklers were incomplete and refusing to permit their installation in that condition, the majority holds that Rafter Seven somehow, at the same time, managed to accept the same goods with regard to the lessor (under this approach, perhaps Schrödinger's cat could be both dead and alive at the same instant). We are not directed by the majority to a single case interpreting U.C.C. § 2A-515 to produce such an enigma, and I would not read the Code to allow this baffling and inequitable result. I therefore cannot accept that Rafter Seven, which never received delivery of the sprinklers for which it had bargained, can be said to have had an opportunity to inspect them.[3]

To bolster its conclusion that Rafter Seven took an unreasonable length of

reasonable); GNP Commodities, Inc. v. Walsh Heffernan Co., 420 N.E.2d 659, 665 (Ill. App. Ct. 1981) (two months reasonable); La Villa Fair v. Lewis Carpet Mills, Inc. 548 P.2d 825, 832 (Kan. 1976) (nine months reasonable).

[3] I recognize that in a lease transaction, U.C.C. § 509(b), Wyo. Stat. Ann. § 34.1-2.A.509(b), requires that the lessee give notice of rejection to the lessor, not the seller. In this case, however, Rafter Seven was still attempting to prod Ochs, the only party with any power to effect the complete delivery of the second and third sprinkler systems, into fulfilling its obligations before Rafter Seven could exercise its right to test. These events were therefore prerequisite to giving the notice of rejection implicated by § 509(b).

time to inspect, the majority relies on a treatise which explains the policy rationales requiring "speedy notification" of rejection. Tellingly, none of these policies are furthered by my colleagues' disposition. For example, timely rejection gives a seller an opportunity to cure, Maj. Op. at 15 (quoting James J. White & Robert S. Summers, Uniform Commercial Code § 8-3 at 445-46 (4th ed. 1996)), but there is no doubt that the <u>seller</u> in this case—Ochs, not Brown—was unambiguously on notice that it had not delivered goods that were fit for installation and testing. The party with an opportunity to actually deliver conforming goods was therefore immediately on notice that the sprinklers it had delivered thus far were not satisfactory. <u>See, e.g.</u>, <u>EPN-Delaval, S.A. v. Inter-Equip, Inc.</u>, 542 F. Supp. 238, 247 (S.D. Tex. 1982) (observing that the "purpose [of notice of rejection] is to inform the seller that the buyer rejects the goods in sufficient time to give the seller opportunity to cure, and to assist in minimizing the buyer's losses").

This remains true even if, as a technical matter, Brown, not Rafter Seven, was the "buyer" with regard to Ochs. <u>See</u> <u>Midwest Precision Servs., Inc. v. PTM Indus. Corp.</u>, 887 F.2d 1128, 1132 (1st Cir. 1989) (describing the role of the parties in a tripartite lease-finance arrangement). Ochs pitched the sprinklers to Rafter Seven, Ochs took its "down payments," Ochs set up the meeting between Brown and Friesen, and Ochs was paid. It only makes sense that Rafter Seven would demand performance from Ochs, not Brown. Brown had long ago paid

-7-

Ochs for the sprinklers, so it was not in a position to pressure Ochs into delivering conforming equipment.[4]  Rafter Seven never received that equipment from Ochs and it never saw a penny of Brown's money.

Moreover, this delay must be viewed in perspective:  Rafter Seven was promised sprinkler systems in May.  If Brown had learned of Rafter Seven's definitive rejection in, say, early October instead of early November, it would have made little practical difference for the purposes of mitigating Brown's losses.  (Unless I am sorely mistaken, there are no farmers in Wyoming who plant crops in October for calendar year production.)  Indeed, Brown received a July 10 letter informing it that Ochs failed to deliver the sprinklers, and admits that thereafter it had no idea, one way or another, whether the sprinklers were ever shipped.

There is also little likelihood that the six-week inspection period compounded Brown's losses through "depreciat[ion], rot[ting], or worse . . . ."

---

[4] In fact, as the majority interprets the U.C.C., Brown had no stake in whether Ochs' upheld his end of the bargain because it had Rafter Seven sign the Delivery and Acceptance clause before Rafter Seven had an opportunity to inspect.  If this is the case, the U.C.C. utterly fails the lessee by allowing the lessor to shift risk to the lessee at no cost to itself.  Brown only accepted the usual risk that Rafter Seven will default, and Ochs merely had its bargained-for obligation to supply the goods, but Rafter Seven was saddled with both its bargained-for obligation to make lease payments and the risk that Ochs would not perform.  In essence, the lender-lessor has created a high-risk financial product, and should assume a heightened duty commensurate with the risk it has created. Cf. Am. L. Prod. Liab. 3d § 1:9.

Maj. Op at 14 (quoting White & Summers at 445-46).  We are not dealing with a

contract for refrigerated trucks filled with arugula, but rather one for non-fungible

sprinklers.  See Moses, 568 S.W.2d at 121 ("What is a reasonable opportunity

varies, depending upon the type of goods involved."); Buckeye Trophy, Inc. v. S.

Bowling & Billiard Supply Co., 443 N.E.2d 1043, 1046 (Ohio Ct. App. 1982)

(trial court did not err in finding a 65-day delay before inspection reasonable

when, among other things, the goods were "not perishable or subject to severe

market fluctuations").  Brown does not dispute that the second and third sets of

sprinklers not only failed to match the descriptions in the leases, they were also

ancient, lacking in essential parts, and, as delivered, largely worthless.  This is

not a case where a lessor suffered some appreciable loss due to a few weeks'

delay or where "the entire loss from the transaction [would have been] minimized

by early action."  Maj. Op. at 15 (quoting White & Summers at 445-46).[5]  To the

contrary, the incomplete sprinklers remained on Rafter Seven's property because

---

[5] None of this should have come as any surprise to Brown.  As early as July 10, 2001, Erol Klassen, Rafter Seven's manager, wrote Brown to tell him that Rafter Seven Ranch

> has not seen the $80,000.00 you advanced toward the purchase of sprinklers, or four operating sprinklers as promised by Mr. Ochs.  As of this date we have delayed planting some crops as long as possible. The growing crops are without water, which means they are certain to whither and die under this heat. . . .  As it is now, we are high and dry.  Please give me your thoughts as to what, if anything, I should do.

no party considered them worth the expense of removing them.[6]

## III

Meanwhile, back at the ranch, Rafter Seven did what a reasonable rancher would do under these circumstances. Let us not forget, these sprinklers were to be delivered around May 2001, in time for the planting season; _tempus agrarius fugit_—time flies out on the farm. When Ochs delivered an incomplete mess of sprinkler parts three to four months after tender was due, Rafter Seven, already faced with the loss of its crops, afforded the seller six more weeks for delivery and installation of a testable sprinkler system. Because such a system was never delivered, I do not see how it can be said that Rafter Seven had a reasonable opportunity to test the sprinklers. Even assuming that the sprinklers were "delivered" at all, the six weeks taken for testing was not unreasonable in the circumstances. Consequently, I cannot fathom how Rafter Seven can be liable for the lease payments at issue.

---

[6] The majority also suggests that the form disclaimer of warranty on the back of the lease agreements is a final nail in Rafter Seven's coffin, reasoning that Brown was not liable for defects in the sprinklers, having disclaimed any warranty. However, it is difficult to see how a warranty, or lack thereof, informs the issue in this case. There is no dispute that Ochs delivered nonconforming equipment which Rafter Seven had the right to reject within a reasonable time; the equipment delivered did not match the specific characteristics and serial numbers identified in the leases. At best, Brown disclaimed liability for product defects, not defective performance under the leases. It is the latter that is at issue here.